## In re VAN VLIET.

### (*Circuit Court, E. D. Arkansas.* October 31, 1890.)

1. INTOXICATING' LIQUORS—ORIGINAL PACKAGE LAW—CONSTITUTIONALITY.
   Act Cong. Aug. 8, 1890, which provides that intoxicating liquors when shipped from one state to another "shall, upon arrival, be subject to the operation and effect of the laws of such state," is a legitimate exercise of the power to regulate interstate commerce.

2. SAME—EFFECT ON STATE LAWS.
   Said act subjects liquor shipped into a state to the operation of its prohibitory laws previously passed.

At Law. Petition for *habeas corpus.*

*C. C. Cole,* for petitioner.

*John Y. Stone,* Atty. Gen. of Iowa, for the State.

CALDWELL, J. The facts in the case are admitted, and are as follows: The Excelsior Brewery Company, a corporation of the state of Missouri, shipped from that state to Pella, in the state of Iowa, consigned to the petitioner, who was its agent at that place, a wooden case containing two dozen quart bottles of beer manufactured by the company at St. Louis, Mo. The case containing the bottles of beer was substantially made out of wood, and securely fastened with a metallic seal, and constituted an unbroken or original package. This case of beer, in its original form, the petitioner, as agent for the brewery company, sold at Pella. For this sale he was arrested, tried before a justice of the peace, convicted, and sentenced to imprisonment. On these facts he claims his imprisonment is illegal, and in violation of the constitution of the United States. This claim is rested on two propositions. Stating them in the reverse order from that in which the learned counsel for the petitioner presented them, they are—*First,* that the act of congress, approved August 8, 1890, commonly known as the "Wilson Bill," is unconstitutional and void; and, *second,* that the laws of the state of Iowa, under which the petitioner was tried and sentenced to be imprisoned, are unconstitutional and void.

In discussing the first question it is important to have a clear conception of what the law was, and on what it was grounded before the passage of the act, and what change the act makes in the old law. Before the passage of the act of congress, the right to transport liquor from one state to another included, by implication, the right of the importer to

sell it in the original package, in the state in which the transit ended. By the act of congress, the right which the importer previously enjoyed of selling the liquor in the original package, in the state where the transit ended, regardless of the laws of such state, is taken away, the act declaring that the liquor "shall, upon arrival in such state or territory, be subject to the operation and effect of the laws of such state." The constitutionality of the act in this forum can scarcely be treated as an open question. The constitution declares that "the congress shall have power * * * to regulate commerce * * * among the several states." It was early decided that commerce among the states was subject only to regulations imposed by congress; that the states could not interfere with or regulate such commerce; and that, until congress enacted regulations on the subject, it was free and unrestricted. It was further decided that the right to transport an article of commerce from one state to another included, by necessary implication, the right of the importer to sell, in unbroken packages, at the place where the transit terminated. The rule, in the absence of congressional action, is thus stated by Chief Justice FULLER, in *Leisy v. Hardin*, 135 U. S. 100, 124, 125, 10 Sup. Ct. Rep. 681:

"Under our decision in *Bowman* v. *Railway Co.*, *infra*, they had the right to import this beer into that state, and, in the view which we have expressed, they had the right to sell it, by which act alone it would become mingled in the common mass of property within the state. Up to that point of time, we hold that, in the absence of congressional permission to do so, the state had no power to interfere by seizure, or any other action, in prohibition of importation and sale by the foreign or non-resident importer."

It will be observed that the chief justice, speaking for the majority of the court, does not say that the state, under no conditions, can interfere with the imported liquor, until it is sold by the importer or the package broken; but the statement of the law is that it cannot do so "in the absence of congressional permission." In another passage of the opinion, it is said:

"The responsibility is upon congress, so far as the regulation of interstate commerce is concerned, to remove the restriction upon the state in dealing with imported articles of trade within its limits, which have not been mingled with the common mass of property therein, if in its judgment the end to be secured justifies and requires such action."

Again, it is said the imported article "is not within the jurisdiction of the police power of the state unless placed there by congressional action." Again, it is said:

"Being thus articles of commerce, can a state, in the absence of legislation on the part of congress, prohibit their importation from abroad, or from a sister state, or, when imported, prohibit their sale by the importer?"

Again, the language of the court in *Bowman* v. *Railway Co.*, 125 U. S. 485, 8 Sup. Ct. Rep. 689, 1062, is quoted approvingly where it is said—

"That the transportation of commodities between the states shall be free except where it is positively restricted by congress itself, or by the states in particular cases by the express permission of congress."

The denial to the state of the right to deal with imported liquor in unbroken packages is uniformly accompanied by the same qualifying words, which are repeated in the opinion no less than eight times. See, to the same effect, *Lyng* v. *State*, 135 U. S. 161, 10 Sup. Ct. Rep. 725; *Stoutenburgh* v. *Hennick*, 129 U. S. 141, 9 Sup. Ct. Rep. 256; *Bowman* v. *Railway Co.*, 125 U. S. 465, 8 Sup. Ct. Rep. 689, 1062. These repeated and deliberate utterances of the supreme court establish the proposition that it is competent for congress, under the grant of power to regulate commerce among the states, to determine when a subject of that commerce shall become amenable to the law of the state in which the transit ends. Congress has exercised the power, under the constitution, and has declared that liquor transported from one state to another "shall, upon arrival in such state or territory, be subject to the operation and effect of the laws of such state or territory, enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such state or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." It will be observed that, by the terms of the act, the original package, "upon arrival" in the state, is put on the same footing with liquors "produced in such state." The original package, when it arrives within the state where its transit terminates, is at once reduced to the rank of domestic liquor, enjoys no privileges not enjoyed by domestic liquor, and is "subject to the operation and effect of the laws of such state * * * enacted in the exercise of its police powers, to the same extent and in the same manner" as domestic liquor. Now, there never was any question but what the laws of Iowa prohibited the sale of liquor "produced" in the state, and that the laws for this purpose were constitutional. These laws were in full force at the date of the passage of the act of congress, and that act having, in legal effect, abolished original packages on their "arrival" within the state, by placing them on the same footing with liquor "produced" within the state, they are as much amenable to the state law as if they had never existed in the form of original packages. Congress has abolished the right of the original package to claim exemption from the operation of the state laws by abolishing, in effect, the original package itself, upon its arrival in the state where the transit terminates. The petitioner's allegation, therefore, that the beer he sold was manufactured, bottled, and boxed by the brewery company in St. Louis, and shipped to him at Pella, for sale as the agent of the brewery company, has no more legal significance, under the act of congress, than would be an allegation that the beer was brewed, bottled, and boxed in Pella. The legal effect of the two averments in respect of the operation of the Iowa law on the beer and its sale in Pella would be identical. But it is contended that all the utterances of the supreme court wherein it is said, or is necessarily implied from what is said, that congress may, in regulating interstate commerce, fix the point of time and place when the interstate carriage shall terminate, and the subject of the commerce become amenable to the state law, is *obiter dicta*, which the court should disregard. But clearly these ut-

terances are not *obiter dicta* in the usual sense of that term. The point was so intimately blended and connected with the main question in the case as to render its decision proper, if not necessary. The case was one of great gravity, and what the court said on this subject was evidently well considered, and deliberately uttered, and any inferior court of the United States that would disregard it would fairly subject itself to the charge of judicial insubordination. This court is not called upon to vindicate the soundness of the judgment of the supreme court. That court is quite capable of doing that for itself.

But it is said the act is void, because it is a delegation of legislative power to the states to regulate interstate commerce, and for want of uniformity in its operation. It must be observed that the act does not deal with the liquor after its "arrival" in the state. Congress may regulate interstate commerce, but not intrastate commerce. It may regulate commerce "among the states," but not in the states. The state may regulate purely internal, but not interstate, commerce. The act is drawn in view of these settled principles. In protects the interstate transportation of the liquor until its arrival in the state where the transit is to end, and no longer. . Upon its arrival in the state, the act of congress declares it shall be subject to the laws of the state enacted in the exercise of its police powers. Such laws are not regulations of interstate commerce, but have relation to the local and internal concerns of the state. The right of the state to pass such laws is not derived from the constitution of the United States, or any act of congress; it antedates both. Nor does the act of congress confer, or attempt to confer, on the states the right to regulate the liquor traffic within their jurisdiction. It terminates the privileges previously attaching to the interstate commerce transportation of the liquor, upon its arrival in the state to which it is consigned, instead of protecting these privileges until after the package is broken or sold by the importer. It does this by declaring the liquor shall, upon arrival in the state, be subject to its laws, not as regulations of commerce, but as police regulations.

It is said the supreme court declared these laws to be unconstitutional, in so far as they prohibited the sale of liquor by the importer or his agent in the original packages, and that congress could not, in the language of the learned counsel, "vivify a dead statute." There are two answers to this contention. The first is, the act of congress relegates the original package of liquor, on its arrival in the state, to the laws of the state passed in the exercise of its police powers; and there is not now, and never has been, any doubt of the validity of those laws. It is not the laws of the state, but the original package, that is "dead." No part of the Iowa law is "dead." What was decided by the supreme court was this: That the Iowa law was broad enough in its terms to embrace all liquors and all sales of liquors by every person, but that this law, under the constitution of the United States, was inoperative on liquor imported into the state, as long as it remained in the original packages, and could not be applied to the sale of liquor in the original package by the importer, "in the absence of

congressional permission to do so;" and that any application of the law to original packages in the absence of congressional permission was unconstitutional, and an invasion of the constitutional rights of the importer. There is, therefore, no foundation for the broad statement sometimes made, but not made by the learned counsel in this case, that "the Iowa liquor law was declared to be unconstitutional and void." The court did not declare the statute of Iowa "void," but in legal effect declared its extension or application to liquor in the original packages in which it was imported, in the absence of congressional sanction, was unconstitutional. Every written law has its implications, which are as much a part of it as what is expressed. It has been said that, in view of the decision of the supreme court, it must be held that one of the implications of the Iowa statute, at the time it was passed, was that it should not apply to original packages, and that this implication adheres to it, and can only be got rid of by a re-enactment of the statute under existing conditions. Undoubtedly this statute, like all statutes, had its implications, but it had no such implication as is claimed. If the statute had any legal implication on this subject, it was that the act should not be operative on original packages, or the sale thereof by the importers until congress should give its consent thereto. That consent has been given in plenary terms. It was only by necessary implication that the right of the importer to sell his original packages was upheld. *Bowman v. Railway Co.*, 125 U. S. 499, 8 Sup. Ct. Rep. 689, 1062. An act of the legislature will not be declared unconstitutional in whole or in part where the legal implications fairly deducible from the act will harmonize it with the constitution. A statute is neither unconstitutional nor void for not containing an exception or qualification which the law will imply. Its operation will be restrained within constitutional limits, but the act itself will not be declared void. It was always competent for congress to invest the state with authority to apply its police regulations to liquor upon its "arrival in such state" for sale or consumption, or, what is the same thing, to declare, as the act of congress does, that such liquor shall, upon arrival in the state, be subject to the operation and effect of the laws of the state enacted in the exercise of its police powers. It is not essential that the act of congress should have been passed before the act of the legislature. What congress can authorize to be done it may ratify after it is done. It is said by the supreme court of the United States that "a legislative ratification of an act done without previous authority is of the same force as if done by pre-existing power, and relates back to the act done." *U. S. v. Arredondo*, 6 Pet. 714. Such consent or ratification is equivalent to an original authority, and operates precisely as though authority had previously been given. It is familiar learning that by-laws and ordinances of cities and towns, which were inoperative or "void" for want of legislative power to enact them, are rendered valid and effectual by a subsequent legislative approval or ratification. Dill. Mun. Corp. (4th Ed.) § 79. An act of the legislature, passed in the exercise of the police power of the state, inoperative on liquor in the original packages, when passed, for want of congressional license, is rendered op-

erative and effectual by a subsequent act of congress declaring that such liquor shall be subject to the state law. Such an act removes the impediment to the enforcement of the law against such packages, and has the same effect as a precedent authority of congress to pass it. Such a law does not of course give to the state law a retroactive operation so as to punish a violation of its provisions before its adoption or ratification by congress. But it is said that the state laws referred to in the act of congress are laws to be thereafter passed, and not the laws in force at the date of the passage of the act of congress. It is a notorious fact, and part of the public history of the country, of which the court is bound to take judicial notice, that the decision in Leisy v. Hardin led to the opening up in the states which prohibited the traffic in liquor, or, imposed a high license tax on the traffic, of what were popularly called "original package houses." Liquor imported in packages of all forms and sizes, but all original packages, was sold in these houses. In this way the retail traffic in liquor was practically established, and in many cases by the most irresponsible and unsuitable persons who were not citizens of the state, and were indifferent to its welfare. Peaceful and quiet communities from which the sale of liquor had been banished for years were suddenly afflicted with all the evils of the liquor traffic. The seats of learning were invaded by the original package vender, and the youth of the state gathered there for instruction were corrupted and demoralized, and disorder, violence, and crime reigned, where only peace and order had been known before. The invaded communities were powerless to protect themselves. They could neither regulate, tax, restrain, nor prohibit this traffic. The courts held, and rightly so, that the importer and vender of original packages was not subject to the state law, and that any application of the state law to him would be an invasion of his rights under the constitution of the United States, until congress, in the exercise of its power to regulate commerce, should withdraw the protecting shield of that instrument from original packages that had reached the state where they were destined for consumption or sale. Congress was appealed to for relief. Petitions flowed in upon it praying for immediate action. It acted promptly, and with more celerity than ordinarily characterizes the action of so large a deliberative body, and the president approved its action. In the light of these facts it is absurd to say that congress did not intend to subject original packages to the operation of the existing state laws, but only to laws thereafter to be passed. Why should 40 states be compelled to call together constitutional conventions or legislatures, or both, merely to re-enact verbatim these existing laws? for it is conceded a verbatim re-enactment of the existing laws would remove this objection. The obvious design and intention of congress was to withdraw at once the protecting shield of interstate commerce from original packages of liquor the moment they entered the state where their transit was to end, by placing them on the footing of liquor "produced" in the state, and declaring they should be subject to the same laws. This was what the supreme court, as I construe their opinion, had said congress might do, and it is what it did

do, in language that admits of no evasion or discussion. The act of congress is a remedial statute, and the rules for the construction of such statutes declare they are to be liberally construed, and everything is to be done in advancement of the remedy that can be given consistently with any construction that can be put upon it; and that, in construing a remedial statute which has for its end the protection of important and beneficial public objects, a large construction is to be given, when it can be done without doing violence to its terms. *Wolcott* v. *Pond*, 19 Conn. 597. The supreme court of the United States has said:

"The meaning of the legislature may be extended beyond the precise words used in the law, from the reason or motive upon which the legislature proceeded, from the end in view, or the purpose which was designed." *U. S.* v. *Freeman*, 3 How. 565.

In the construction of a statute it is always legitimate to look at the history of the times and examine the state of things existing when it was framed and passed. The act of congress is not ambiguous or doubtful, but if it was, the application to it of these canons of construction would remove the ambiguity or doubt. It is undoubtedly true that the power to regulate commerce among the states rests with congress alone, and that any rule congress prescribes on the subject must be uniform in its operation. It is objected against the act of congress that it is not uniform in its operation, but adopts the varying liquor laws of the several states. In the constitutional grant of powers to congress to regulate commerce among the states, it is not said that such regulations shall be uniform. That requirement is implied from the nature of the subject. The constitution declares that congress shall have power to establish "uniform laws on the subject of bankruptcies throughout the United States." In reference to laws on the subject of bankruptcies, the constitution itself requires they shall be "uniform," and does not leave that requirement to implication, as is done in the case of laws regulating commerce. The bankrupt act of 1867 adopted the exemption laws of the several states, and gave to the bankrupts in the several states the property exempt from execution, by the laws of the state of their residence. The bankrupt act was assailed as unconstitutional, because there was no uniformity in the amount of property exempted to bankrupts, the amounts varying with the varying laws of the states. The point arose in this circuit, and the act was held constitutional for reasons which are equally applicable to the "Wilson Bill." That opinion was concurred in by Mr. Justice MILLER, and was ultimately accepted as a sound exposition of the law by all the district courts of the United States. *In re Beckerford*, 1 Dill. 45. That case ought to be conclusive, in this circuit, of the question in the case at bar. There is no want of uniformity in the act of congress. It adopts one uniform rule, which is that the interstate transit shall end upon the arrival of the liquor in the state to which it is consigned and that thereafter it shall be subject to the state law. This rule prevails throughout the whole country, and is therefore a uniform rule. If the court entertained any reasonable doubt of the petitioner's right to a discharge, it would not discharge him, but in the exercise of

its discretion would remit him to his right of appeal. *Ex Parte Royall,* 117 U. S. 241, 6 Sup. Ct. Rep. 734. The petition for discharge is denied, and the petitioner remanded to the custody of the state authorities in execution of the sentence imposed upon him.