STATE OF NORTH DAKOTA EX REL. WILLIAM LANGER,
Attorney General for the State of North Dakota, v. LEWIS F.
CRAWFORD, Frank White, J. D. Taylor, Emil Scow, and J. A.
Power.

(162 N. W. 710.)

**State Board of Regents — members nominated — by governor — senate confirms — statutes — legislature — session of — during — initiative — referendum — state Constitution.**

The provision in § 2 of chap. 237, Laws 1915 (commonly known as the
State Board of Regents Act), empowering the governor to nominate and the
senate to confirm nominations for the offices of members of the State Board of
Regents during the same session of the legislature at which the act creating the
offices was enacted, does not conflict with or contravene the initiative and referendum amendment to § 25 of the state Constitution.

Opinion filed April 28, 1917. Rehearing denied June 20, 1917.

Original proceeding by the state on the relation of William Langer,
Attorney General, for a writ of quo warranto, to oust Lewis F. Crawford, Frank White, J. D. Taylor, Emil Scow, and J. A. Power from
the offices of members of the State Board of Regents.

Writ denied.

*William Langer,* Attorney General, *H. A. Bronson* and *D. V. Brennan,* Assistant Attorneys General, for relator.

*Lawrence & Murphy* and *Fisk, Linde, & Murphy* for respondents.

ROBINSON, J. This is a simple case. Its purpose is to oust the Board
of Regents on the ground that their appointment was irregular. The appointment was made by the governor on March 9th, 1915. It was made
pursuant to a resolution of the senate passed on March 5th, under an
act approved March 4th, 1915. This act contains an emergency clause,
as per § 67 of the Constitution. On its final passage in the house there
were 74 ayes, no nays, and 38 absent, and not voting; in the senate there
were 45 ayes, no nays, and 4 absent or not voting, and so the bill was
regularly passed in accordance with this § 67, which reads: Section 67.
"No act of legislative assembly shall take effect until July first, after
the close of the session, unless in case of emergency (which shall be ex-

36 N. D.—25.

pressed in the preamble or body of the act) the legislative assembly shall, by a vote of two thirds *of all the members present in each house,* otherwise direct."

So far as material, § 25 of the Constitution, as amended, is as follows: "The second power is the referendum, or the power to order an act, item, or part of any act, to be referred to the people for their approval or rejection at the polls, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety), as to any measure or any parts, items or sections of any measures passed by the legislative assembly either by a petition signed by 10 per cent of the legal voters of the state from a majority of the counties, or by the legislative assembly, if a majority of the members elect vote therefor. When it is necessary for the immediate preservation of the public peace, health or safety that a law shall become effective without delay, such necessity and the facts creating the same shall be stated in one section of the bill, and if upon aye and no vote in each house two thirds of all the members elected to each house shall vote on a separate roll call in favor of the said law going into instant operation for the immediate preservation of the public peace, health or safety, such law shall became operative upon approval by the governor.

.          .          .          .          .          .          .

*Any measure referred to the people shall take effect when it is approved by a majority of the votes cast thereon, and not otherwise, and shall be in force from the date of the official declaration of the vote."* The meaning of this last sentence is that if an act has been referred to the people, it shall take effect only when it is approved by a majority of the votes cast thereon.    This applies to all acts passed without an emergency clause, as such acts do never take effect within ninety days.    The amendment does not in any way repeal or modify § 67 of the Constitution.    It may be extremely important that an act not relating to the public peace, health, or safety should take effect on its passage.    Manifestly it was not the purpose of the referendum to put it in the power of 10 per cent of the voters to block and hold up until a general election the most important measures that might be passed by the unanimous or the two thirds vote of the legislative assembly.    Such a power to block and hold up might be very disastrous to the state and to the rule of the people.

The people have justly more confidence in the unanimous or two thirds

vote of their duly elected representatives than in 10 per cent of the voters. Were it not so the referendum section should have expressly repealed § 67 and provided that, excepting acts relating to the public peace, health, and safety, no act should take effect until the time limited for a referendum petition.

The act relating to the appointment of a Board of Regents, which is chap. 237 of the Laws of 1915, was passed with an emergency clause as provided by § 67 of the Constitution, and on March 4th it became a law, and the appointments made under it were in all respects regular and according to law. There is no reason for holding that in appointing the Regents the governor had any kingly powers, or any power except as given by the plain words of the statute then in full force and effect. Objection was made to the nomination by the governor before the act took effect, but the nomination was a mere incident. It was no part of the appointment. It was merely a continuous recommendation from the time it was made until it was approved by the senate.

There is another point of no small importance which was not presented by either counsel. It relates to the practical construction of the emergency provision of the Constitution. The referendum amendment was adopted by a vote of the people at the general election in 1914. The following legislative assembly passed 273 acts. No act was passed with an emergency section as provided for by the referendum amendment, but 64 acts were passed with an emergency section as provided for by § 67 of the Constitution. Each act declared that it should take effect and be in force from and after its passage and approval, and each of the 64 acts were given immediate force and effect. Now, it is fearful to contemplate the complications and wrongs which might result from holding void all proceedings under the 64 acts from their passage until the following July.

As the Laws of 1917 have not yet been published, I cannot give so definite a statement regarding the emergency clauses. Many of them are framed under § 67, and others under the peace, health, and safety section.

Thus the Sabbath Bill declares it necessary for the peace, health, and safety that the bill should take effect and be in force from and after its passage.

A bill appropriating $1,500 for railroad commissioners declares it

necessary for the peace, health, and safety; and so of a bill appropriating a few dollars for the school of mines; and so of a bill taking private property to lay out a highway.

And a bill appropriating $75 expense on a bust of Abraham Lincoln is declared to be necessary for the public peace, health, and safety. There is no emergency clause which complies with the Constitution in regard to stating the facts showing that it is necessary for the public peace, health, and safety that the law should become effective without delay.

There has also been presented a kind of moot question concerning the future power of the governor to fill vacancies. The members of the board are appointed for a definite term of years, and by § 3 of the act it is provided that in case of a vacancy the governor may fill the same by appointment until the commencement of the next session of the legislative assembly. The members are appointed for a definite term of years, and it must follow at the end of each term a vacancy does exist which the governor may fill by appointment. The members of the present board have been duly appointed to hold for a definite term of years, as shown by their commission and certificate of appointment, and that commission shows when their term of office expires. The petition should be denied.

BRUCE, Ch. J. (specially concurring). I concur with Mr. Justice Robinson that the petition in this case should be denied. I do not, however, fully concur in all that he has said or in the result which he arrives at on his last proposition.

I am clearly of the opinion that there are two emergency clauses provided for in North Dakota, or rather an emergency clause and a clause which denies the right to a referendum in certain cases. I am satisfied that these clauses are not inconsistent with one another.

Section 67 of art. 2 of the Constitution provides that "no act of the legislative assembly shall take effect until July first, after the close of the session, unless in case of emergency (which shall be expressed in the preamble or body of the act) the legislative assembly shall by a vote of two thirds of all of the members present in each house, otherwise direct."

Section 25 of art. 2, before its amendment, merely provided that "the

legislative power shall be vested in a senate and house of representatives."

It said nothing in regard to the time in which a bill should take effect.

The amendment to this section and article not only did not repeal its provisions, but re-enacted the whole of the original section. It merely added to the general and fundamental enactment that "the legislative authority of the state of North Dakota shall be vested in a legislative assembly consisting of a senate and house of representatives;" the further provisions that "the people reserve to themselves power to propose laws and enact or reject the same at the polls," and that "any measure *referred* to the people shall take effect when it is approved by a majority of the votes cast thereon and not otherwise, and shall be in force from the date of the official declaration of the vote."

Nothing is said in the amendment as to the status of laws which have been passed by the legislative assembly and which have *not* been referred. The only provision on the subject is that "the filing of a referendum petition against one or more items, sections or parts of an act shall *not delay the remainder of that act from becoming operative.* Referendum petitions against measures passed by the legislative assembly shall be filed with the secretary of the state not more than ninety days after the final adjournment of the session of the legislative assembly which passed the measure on which the referendum as demanded."

I can find nothing in the Constitution and the amendments thereto which in any way nullifies or retards the operation of an act or a part of an act which has not been referred, or which prohibits the legislature from making an act which has not been so referred immediately operative under the provisions of § 67 of article 2.

The acts, of course, are subject to be referred under the provisions of the referendum amendment. That referendum, however, is in the nature of a veto power. The amendment itself takes pains to re-state the provision of the former section that "the legislative authority of the state of North Dakota shall be *vested in a legislative assembly.*" Bills still bear the title, "Be It Enacted by *the Legislative Assembly* of the State of North Dakota." I can see no intention or intimation of any intention that the sovereign power of legislation vested in the legislative assembly should be in any way curtailed, *unless a referendum is demanded and had.*

We have, indeed, in North Dakota, absolutely repudiated any theory of "the Kings, the Lords, and the Commons," and that the executive is a part of the legislative body, and we have adopted the same theory in regard to the referendum. In England the consent of the Monarch is absolutely necessary to the validity of an act, for it is "the King, the Lords, and the Commons" who enact. In North Dakota the executive, the governor, has merely a veto power, and his signature is only evidence that that veto power will not be exercised. Unless, indeed, the veto is made within three days after the presenting of an act during the session of a legislative or within fifteen days after the termination thereof, in case of bills which are not presented to the governor until three days before the end of the session, the bills are operative without the executive sanction at all. The same, I believe, is true of acts which may be referred, *if the people do not demand a referendum.* The bill is, and always was, a valid act, and the sanction of the people is not necessary to the validity of the legislative enactment. When the legislature passed the act in question in the case at bar, they had the right under the Constitution to express their desire that it should be immediaely operative. This they did, and the people have not thought fit by referring the measure to interfere with their determination.

I have carefully examined the cases which are cited by counsel for petitioner, but none of them seem to me to be conclusive on the question, nor to warrant us in departing from the well-established rule that the various clauses and sections of the constitutional and legislative provisions should, if possible, be construed together, and a purpose and a meaning be ascribed to each.

It is to be noted, indeed, in examining these cases that the California and Arkansas Constitutions contain no provisions which are similar to § 67 of the Constitution of North Dakota. It is also to be noted that in the case of Atty. Gen. ex rel. Barbour v. Lindsay, 178 Mich. 524, 145 N. W. 98, the supreme court of Michigan partly based its decision on the proposition that a constitutional provision corresponding to § 67 of the Constitution of North Dakota had not been allowed to remain as a separate section, but had been incorporated in the new section of the new Michigan Constitution of 1908, and that the new clause was, therefore, exclusive and restrictive upon the former powers granted to the legislature.

The Missouri Constitution contains a provision similar to § 67 of the North Dakota Constitution, but an examination of the act involved in State ex rel. Kemper v. Carter, 257 Mo. 52, 165 S. W. 773, cited by the attorney general, discloses that there was no emergency clause whatever in the bill under consideration. Consequently, while some of the language used by the Missouri supreme court in that case tends to support the contentions of the attorney general, yet such language is obviously *obiter.*

The Oregon court, it is true, announces a rule contrary to that herein expressed, but it is to be noted that in Oregon there was no provision similar to our own, which requires a two thirds vote to put the emergency clause into operation. There, the Constitution merely reads: "No act shall take effect until ninety days from the end of the session at which the same shall have been passed, except in case of emergency; the emergency shall be declared in the preamble or in the body of the law." Or. Const. § 28.

In the Washington case of State ex rel. Brislawn v. Meath, 84 Wash. 302, 147 Pac. 11, the only question really under consideration was whether the courts could go back of the legislative declaration of an emergency and inquire into the fact as to whether an emergency really existed. It is to be noticed, too, that, although there is in the Constitution a provision which is similar to § 67 of art. 2 of the Constitution of North Dakota, the provision in regard to the referendum is not the same. The North Dakota Constitution provides that "any measure *referred* to the people shall take effect, etc." The Constitution of Washington provides that "no act, law, or bill, *subject to the referendum,* shall take effect until ninety days after the adjournment of the session at which it was enacted." Wash. Const. § 1, ¶ C. The Washington provision, it will be thus seen, clearly refers to all acts which *may be referred,* while the North Dakota provision, as we have before stated, merely refers to measures which *have been referred.*

In the case of State ex rel. Richards v. Whisman, 36 S. D. 260, L.R.A.1917B, 1, 154 N. W. 707, all that was said by the court as to the laws going into immediate operation was merely *dicta.* The only question involved was whether the legislature had the power to repeal an act which had been initiated by the people.

If, too, as is pointed out by Mr. Justice Robinson, we resort to the aid

of contemporaneous construction, we can only arrive at the same con-
clusion as that before expressed. To hold, indeed, with the contention
of petitioners, would be to invite suits for the recovery of the oil inspec-
tion fees; the exaction of which was authorized by the same legislature.
It would invalidate bonds and upturn contracts. Not only, indeed, did
the legislature act on the assumption that an act could be put into im-
mediate operation in the case of a large number of civil measures, but in
a criminal matter of high importance. By adding an emergency clause
it saved a criminal from the gallows, even after the deathwatch was set.
Not only, indeed, did the legislature adopt the theory of immediate
operation, but all of the state officials also.

It is, too, worth remembering that at least one half of the members of
the senate in 1915 were members of that body in 1913, and that the
same is true of a large number of the members of the lower house. State
ex rel. Lavin v. Bacon, 14 S. D. 394, 85 N. W. 607.

The initiative and referendum amendment to § 25 of the Constitution
was introduced as Senate Bill No. 32 (Sess. Laws 1913, chap. 101) by
Senator Overson. The record shows that among the senators who voted
in favor of the proposed amendment were Senators Bronson (one of the
present assistant attorneys general), Overson, who introduced the bill,
and Davis. Senate Journal 1913, p. 1076. The records also show that
at the 1915 session Senator Bronson introduced an act making an ap-
propriation of $15,000 for the Grand Fork's Fair Association, with an
emergency clause drafted under the provisions of § 67 of the Constitu-
tion. See Sess. Laws 1915, chap. 45. Senator Overson introduced a
bill appropriating moneys to the North Dakota Antituberculous Asso-
ciation, with an emergency clause under the same provisions of the Con-
stitution. Sess. Laws 1915, chap. 7. Mr. Torson, a prominent attorney
and member of the then house of representatives, introduced a bill pro-
viding for the abolition of the death penalty, which was made applicable
to persons who had theretofore been convicted of murder, and in order to
cover the case of Milo, then in the death cell in the state's penitentiary,
and attached to this bill was an emergency clause drafted under § 67 of
the Constitution. Senator Davis, who voted for the initiative and refer-
endum amendment, as a member of the 1913 senate, was the chairman
of the committee on state affairs, to whom the Board of Regent's Bill was

referred, and signed a report recommending the same for passage, with certain amendments. See Senate Journal, 1915, p. 738.

It hardly appears to me, however, that the matter of the emergency clause needs to be considered at all. Surely the legislature could have asked the governor to submit nominations for offices which they were about to create, and could then have provided in the bill that, when it took effect, those persons should be entitled to hold the office who should theretofore have been nominated by the governor and approved by them. This, even though the bill did not go into effect until July the first, was the result of the situation which is before us. State ex rel. Clark v. Irwin, 5 Nev. 111; Throop, Pub. Off. § 91.

Counsel for the petitioner himself argued, and we believe correctly, that under § 78 of the state Constitution the appointing power of the governor of North Dakota is confined to filling vacancies in office in cases where no other mode of appointment is provided for by the Constitution or laws for filling the same. See State ex rel. Standish v. Boucher, 3 N. D. 389, 21 L.R.A. 539, 56 N. W. 142.

He himself, however, conceded, for the proposition is laid down by the case which he himself cites, and he himself furnished the quotation, that the appointing must vest somewhere and that somewhere is in the legislature. "All governmental sovereign power is vested in the legislature, except such as is granted to the other departments of the government or expressly withheld from the legislature by constitutional restriction." Ibid.

It is also clear that the State Board of Regents is not a constitutional office, but one of legislative creation merely. There can be no reason why the legislature cannot delegate the power to appoint in the same manner as they delegate the power to appoint the president of the State University and Agricultural College and the heads of the various departments. There can also be no reason why they should not themselves name the officials who shall be chosen or who shall choose them. In the bill in question, though they delegated the power of nomination to the governor, they desired to vest the ultimate right of choice in the senate. Why should this not be done? And, even if the office did not take effect until the first day of July, why should they not say that the incumbents should be chosen ahead and with the advice and consent of the state senate, rather than by the governor alone? Would there be anything out

of the way, indeed, for the legislature to have provided for the establishment of a normal school at Dickinson or some other place which should be opened on July the first, and whose president should take office on July first and of choosing in advance who that president should be?

The legislature certainly had the power to pass the act which is before us, and to create the office. It had an inherent power of appointment. State ex rel. Standish v. Boucher, supra; State ex rel. Richardson v. Henderson, 4 Wyo. 535, 22 L.R.A. 751, 35 Pac. 517. It is not necessary that an office shall already be in existence or a present vacancy exist in order that the appointing power may be exercised. There is nothing in the Constitution to prevent prospective appointments. If, indeed, as has been repeatedly held, an incumbent of a judicial office can be elected at the same elections at which the creation of the office or district is voted upon, there can certainly be no reason why the legislature, which possesses all sovereignty not limited by the Constitution, cannot provide in the act itself who shall fill the office; that is to say, make prospective appointments, which shall take effect when the time for filing a referendum petition has expired, and the bill, beyond any question of a doubt, becomes operative. State ex rel. Whitney v. Van Buskirk, 40 N. J. L. 468, 469; State ex rel. Thompson v. Winnett, 78 Neb. 379, 10 L.R.A.(N.S.) 157, 110 N. W. 1113, 15 Ann. Cas. 781; 23 Am. & Eng. Enc. Law, 347; State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705.

Even if the appointment was without authority before the time for the filing of the petition for a referendum had expired, it was ratified and approved when the act went into operation. United States v. Arredondo, 6 Pet. 691, 8 L. ed. 547; Wells v. Nickles, 104 U. S. 444, 26 L. ed. 825.

Incidently, there has been injected into the case the suggestion that at any rate the terms of two of the Regents will expire on the first day of July, 1917, and the question is asked whether at such time the governor may fill the offices by appointment. The question really revolves around the meaning of the term "vacancy" which is used in § 3 of chapter 237 of the Laws of 1915, and which chapter created the Board of Regents. Section 2 of the act provides that "the governor is empowered, and it is hereby made his duty, on or before the 2nd day of March, A. D. 1915, to

nominate, and with the consent of the majority of the members of the senate in executive session, to appoint as such State Board of Regents two members thereof whose term of office shall be two years commencing with the first day of July, A. D. 1915, two members thereof whose term of office shall be for four years commencing with the first day of July, A. D. 1915, and one member thereof whose term of office shall be for six years, commencing with the first day of July, A. D. 1915, and thereafter and during the session of the legislative assembly, and prior to the 15th day of January in each year in which the term of office of any member so appointed shall expire, he shall in like manner nominate, and, subject to such consent of a majority of the senate, appoint a successor or successors to such member or members of said board whose term will expire with July 1st of that year, which said appointee shall hold office for the full term of six years from and after the expiration of the full term of office for which such predecessor or predecessors were appointed. In event any nomination made by the governor to such board is not consented to and confirmed by the senate as hereinbefore provided, the governor shall again nominate a candidate or candidates for such office at any time while the legislative assembly is in session. The members of the board first so appointed shall meet at the seat of government on the first Tuesday in April, 1915, and shall organize and elect one of their members as president of such board for a term of one year. They shall also elect a competent man as secretary who shall receive not to exceed $2,500 per annum, and who shall reside during his term of office in the city of Bismarck."

Section 3 provides: "The governor may remove any member of the board so appointed for incompetency, neglect of duty, immorality, malfeasance in office, or for other good cause, and in case of a vacancy in the membership of the board so appointed by the governor or his predecessor in office, whether occurring by reason of removal or otherwise, may declare the office vacant and fill the same by appointment until the convening of the next session of the legislative assembly, when he shall nominate some qualified person as a member of such board for the balance of such unexpired term and upon the consent of the senate as hereinbefore provided, shall appoint said nominee as a member of such board."

It is very clear to me that the governor has no such power of appointment as is claimed by the petitioner. I am of the opinion that the ex-

piration of a prescribed term, when coupled with the fact that the senate of the preceding legislature adjourned without confirming successors in office (to persons holding under a former appointment), and especially where no nominations were presented to the senate to fill such offices when the term should expire, will not operate to create a vacancy in the office which, under the statute, can be temporarily filled by the governor, and that the vacancies contemplated by the statute to be filled by him are actual vacancies and such as arise from death, resignation, and like causes."

This was certainly held by this court in the case of State ex rel. Standish v. Boucher, 3 N. D. 389, 21 L.R.A. 539, 56 N. W. 142, in construing § 1 of chapter 3 of the Laws of 1889, and seems to be clearly the intention of chapter 237 of the Laws of 1915.

Section 78 of the Constitution provides that "when any office shall from any cause become vacant, *and no mode is provided by* the Constitution or law for filling such vacancy, the governor shall have power to fill such vacancy by appointment."

We have not, in North Dakota at any rate, "set up Kings to rule over us," and the governor has no royal prerogatives. His power are not inherited or inherent, but are only such as have been given to him. Among these powers granted are not to be found the general power of appointing to public office. That power is reserved to the legislature. See State ex rel. Standish v. Boucher, supra; Fox v. McDonald, 101 Ala. 51, 21 L.R.A. 529, 46 Am. St. Rep. 98, 13 So. 416; State ex rel. Sherman v. George, 22 Or. 142, 16 L.R.A. 737, 29 Am. St. Rep. 586, 29 Pac. 356; State ex rel. Richardson v. Henderson, 4 Wyo. 535, 22 L.R.A. 751, 35 Pac. 517. The power of the governor is merely to fill vacancies, and even this power is limited.

This is not only the general fact and rule, but was certainly the intention of the act which is before us. It provides that, although the legislature in each year meets in the month of January, and the terms of office of the members of the Board of Regents do not expire until the 1st of July of the several years, nevertheless, *"during* the session of the legislative assembly, and prior to the 15th day of January in each year in which the term of office of any member so appointed shall expire, he [the governor] shall in like manner nominate, and *subject to such consent of a majority of the senate,* appoint a successor or successors to such

member or members of said board whose term will expire with July 1st of that year. . . ." It further provides that "in event any nomination made by the governor to such board is not consented to and confirmed by the senate as hereinbefore provided, the governor shall *again nominate a candidate or candidates for such office at any time while the legislative assembly is in session.*"

A perusal of these sections convinces me that the legislature chose to reserve *to itself,* or rather to its senate, *the ultimate right of appointing the respective members of the Board of Regents.* It would be a travesty on the law and an insult to the legislature to hold that the governor, by the simple expedient of failing to submit nominations and to obey the commands of the statute, could usurp kingly prerogatives and secure to himself the unlimited and uncontrolled power of appointment. If he could refuse to submit nominations at any session of the legislature, and then could hold the office to be vacant and make a recess appointment on his own behalf, he could take the power from the legislature altogether and nullify the statute altogether. This would be true, not only of the statute before us, but of all similar statutes, and the governor, by virtue of this supposed unlimited appointing power, would be an autocrat.

So, too, it seems to be well established that the word "vacancy," as generally used, is not applicable in such a case. See State ex rel. Standish v. Boucher, supra; State ex rel. Freeman v. Carvey, — Iowa, —, 154 N. W. 934; State ex rel. Richardson v. Henderson, supra.

Section 78 of the Constitution expressly limits the sole and unlimited appointing power of the governor to cases where *"no mode is provided by the Constitution or law* for filling the vacancies." In the case before us the law, that is §§ 2 and 3 of chapter 237 of the Laws of 1915, has expressly provided the mode. These sections have expressly provided that the appointment shall be made in advance and at the immediately preceding session of the legislature, and *with the consent of the senate.* State ex rel. Richardson v. Henderson, supra.

The right of the governor to declare a vacancy, indeed, and to fill a vacancy, seems to be expressly considered in § 3 of chapter 237 of the Laws of 1915. It is very apparent that the vacancy can in only special instances be created by the governor himself, and that it is in those cases alone that he has the power to fill the same. Section 3 provides that "the

governor may remove any member of the board so appointed for incompetency, neglect of duty, immorality, malfeasance in office, or for other good cause, and in case of a vacancy in the membership of the board so appointed by the governor or his predecessor in office, whether occurring by reason of removal or otherwise, may declare the office vacant and fill the same by appointment until the convening of the next session of the legislative assembly, when he shall nominate, etc."

In the case at bar, as we understand the record, it seems to be admitted that there is no charge of incompetency, neglect of duty, immorality, or malfeasance in office. Nor can the words, "for other good cause," be made to include any other cause than that of the general nature of the causes mentioned. It is elementary, indeed, that words of a general nature which follow a specific enumeration must be construed as applying to acts or things or causes of the nature of those which are enumerated. Surely, no immorality or breach of duty on the part of the members of the board exists by reason of the failure of the governor to submit the nominations of their successors to the senate. So, too, he is only authorized to fill a vacancy which occurs by reason "of removal or otherwise," and the word "otherwise" must be construed to apply to an act similar to that of removal, and removal is only authorized under the conditions enumerated.

It is true that in a number of the cases, including the case of State ex rel. Standish v. Boucher, supra, emphasis is laid upon the fact that the officers shall hold their offices until the time fixed and "until a successor is appointed and qualified." None of them, however, go to the extent of holding that the decision would be different if this clause were lacking. It seems, indeed, to be the general law, at least the law that is supported by the better reason and the greater weight of authority, that all public officers who have public duties to perform which are of moment to the state, and the discontinuance of which will be fraught with public inconvenience, are entitled to hold their offices until their successors are elected and qualified, unless some restrictive words are expressly or impliedly used in the Constitutions or statutes. There are no such restrictive words in the Constitutions or statutes of North Dakota, and the statute itself, as I have before intimated, clearly evidences an intention that the appointment shall be made by the senate, nd not by the governor. See Throop, Pub. Off. § 325, and cases cited; 23 Am. & Eng. Enc.

Law, 412, and cases cited; Brady v. Howe, 50 Miss. 607; People ex rel. Stratton v. Oulton, 28 Cal. 44; State ex rel. Richardson v. Henderson, 4 Wyo. 535, 22 L.R.A. 751, 35 Pac. 517.

I am not unmindful of the case of State ex rel. Wood v. Sheldon, 8 S. D. 525, 67 N. W. 613. In that case, however, no provision whatever was made for the appointment of the successor.

I am of the opinion that the petition should be denied.

CHRISTIANSON, J. (concurring specially). I concur in the proposition announced in the syllabus, and in the result reached in the opinions prepared by my associates Mr. Justice Robinson and Mr. Chief Justice Bruce. I desire, however, to base my conclusion upon somewhat different grounds. And in view of the importance of the questions involved, I deem it my duty to discuss these at some length.

The bill for the State Board of Regents Act was introduced in the house of representatives by the committee on education, on February 8th, 1915. As introduced, the bill authorized and empowered "the governor . . . on or before the 21st day of February A. D. 1915, to nominate, etc." When the bill was placed on its third reading and final passage in the house of representatives, on February 17th, 1915, certain amendments were adopted by unanimous consent, among others, one extending the time in which the governor makes nominations of members of the State Board of Regents to February 27th. (See House Journal, 1915 p. 816.) The bill was placed on its first and second reading in the senate, and referred to the committee on state affairs on February 19th, 1915, and reported by the committee with recommendation to pass on February 25th, with three proposed amendments, among which was one extending the time in which the governor make his nominations of members of the Board of Regents to March 2nd (Senate Journal, p. 738). The report was adopted without dissent, and the bill was thereafter placed on its third reading and final passage, and passed in the senate, on February 25th, 1915, with certain amendments. The house refused to concur in some of the senate amendments, and the bill was referred to a conference committee on February 27th, 1915. The bill as amended by the conference committee was passed by the house on March 1st, 1915 (see House Journal, p. 1374), and by the senate on March 2nd (see Senate Journal, p. 892).

The present controversy arises, and involves the validity of the first appointments, made under § 2 of the act, which reads as follows: "The State Board of Regents shall consist of five members, all of whom shall be qualified electors and taxpayers of the state, appointed for their fitness, and ability to efficiently serve the people of the state in such capacity, and one member and not more than two of such board shall be appointed from each congressional district, and not more than one member shall be appointed from any one county. No more than one person who is an alumnus of any of the institutions under the control of such board shall be a member thereof at the same time, and any person who has been connected with any of such institutions, either as a member of any normal board of control, or board of trustees, or as an officer or instructor, shall be eligible to appointment as a member of such board within two years after such connection with such institution has been terminated.

"The governor is empowered, and it is hereby made his duty, on or before the 2nd day of March A. D. 1915, to nominate, and with the consent of the majority of the members of the senate in executive session, to appoint as such State Board of Regents two members thereof whose term of office shall be two years commencing with the first day of July, A. D. 1915, two members thereof whose term of office shall be for four years commencing with the first day of July, A. D. 1915, and one member thereof whose term of office shall be for six years, commencing with the first day of July, A. D. 1915, and thereafter and during the session of the legislative assembly, and prior to the 15th day day of January in each year in which the term of office of any member so appointed shall expire, he shall in like manner nominate, and subject to such consent of a majority of the senate, appoint a successor or successors to such member or members of said board whose term will expire with July 1st of that year, which said appointee shall hold office for the full term of six years from and after the expiration of the full term of office for which such predecessor or predecessors were appointed.

"In event any nomination made by the governor to such board is not consented to and confirmed by the senate as hereinbefore provided, the governor shall again nominate a candidate or candidates for such office at any time while the legislative assembly is in session.

"The members of the board first so appointed shall meet at the seat of government on the first Tuesday in April, 1915, and shall organize

and elect one of their members as president of such board for a term of one year. They shall also elect a competent man as secretary, who shall receive not to exceed $2,500 per annum, and who shall reside during his term of office in the city of Bismarck."

The bill as introduced provided: "The members of the board first so appointed shall meet at the seat of government on the first Tuesday in July, 1915, and shall organize and elect one of their members as president. . . ." This was amended by unanimous consent by the house of representatives when the bill was placed on its third reading and final passage, so as to provide for the first meeting and organization of the board to take place on the first Tuesday in April, 1915.

There was no intent on the part of the legislature, however, to bring the educational institutions under the control of the State Board of Regents prior to July 1st, 1915, on which date, under the express terms of the statute, the official terms of the members of the board commenced. And in order to obviate any chance for a misunderstanding on this point, the first sentence of § 7 of the bill was amended at the same time the amendment last above referred to was made by inserting therein the words "July 1st, 1915," as the concluding words in such sentence (see House Journal, p. 816), thereby clearly and unquestionably designating July 1st, 1915, as the date when the educational institutions of the state were to come under the control of the State Board of Regents, and the actual and active discharge of the official duties of such board commence.

The manifest purpose of providing for the organization of the board in April, 1915, was to enable the board to become familiar with its duties and consequently perform better service. This legislative intent was further disclosed in the last section of the act, which declared an emergency to exist "in this, that this act is deemed of immediate importance in order that the board hereby created *may be in a position to take full control of such institutions on July 1st,* A. D. *1915.*"

The sole object of statutory construction is to arrive at and ascertain the legislative intent. When that intent has been ascertained, there is no room for further interpretation. Can there be any question as to the intent of the legislature with respect to the manner in which the first members, and for that matter the succeeding members, of the Board of Regents should be appointed? Obviously none. It is difficult to understand how language could have been more specific and to the point than

36 N. D.—26.

that which the legislature employed in the section quoted above. It will be noted that the legislature carefully prescribed the qualifications of the members of the Board of Regents, and even designated the geographical location of their places of residence.

The act under consideration designated a specific time, and provided a specific manner, in which the members of the Board of Regents must be appointed. It is a well-settled principle of construction that when a statute or a constitutional provision directs that a thing be done by certain persons and in a certain manner, this affirmative contains a negative, that it shall not be done by other persons or in another manner. As was said by this court in State ex rel. Frich v. Stark County, 14 N. D. 368, 103 N. W. 914: "It is a rule applicable alike to statutory and constitutional law that when the law directs something to be done in a given manner or at a particular time or place, then there is an implied prohibition against any other mode or time or place for doing the act." See also 36 Cyc. 1122; Sutherland, Stat. Contr. 2d ed. § 630. The power of the governor to appoint members of the Board of Regents is, by the very terms of the act, conditional, and may be exercised only under the conditions prescribed by the act itself.

"On general principles," as is said by Woodbury, J. (Johnston v. Wilson, 2 N. H. 205, 9 Am. Dec. 50), "the choice of a person to fill an office constitutes the essence of his appointment." The legislature in the plainest possible language said that the members of the Board of Regents to be first chosen should be chosen in the manner which it prescribed. As we have already seen, this provision was deemed of sufficient importance, so that the bill was amended on two different occasions, once by the house of representatives and once by the senate, in order to make it possible to carry it into effect. The amendment disclosed that whatever changes were proposed or made, or whatever differences of opinion may have existed, none existed so far as this particular provision was concerned, and the legislative intent and policy as thus declared were steadfastly and consistently adhered to from the introduction of the bill until its final passage. And so far as the proceedings of the legislative assembly show, not a single member was out of harmony therewith. When the date was changed from February 21st, to February 27th, by the house of representatives on February 17th, 1915, the journal shows that there were ninety votes cast in the affirmative, and that the unani-

mous consent was given to the proposed amendment. And the records show that not a single vote was ever cast in the negative, in either house at any time this bill was moved for passage. It is interesting to note in this connection that Mr. Bronson, one of the present attorneys for the relator, and then a member of the state senate, twice cast his vote in favor of the measure, including the amendments. (See Senate Journal, pp. 746, 892.)

It is conceded that the respondents in this case were nominated and appointed in strict accordance with the provisions of the State Board of Regents Act; but it is contended that the act was not in effect at the time the appointments were made, and that it was beyond the constitutional power of the legislature to authorize and provide for the appointment of members of the State Board of Regents until the act by which the offices were created had become an existing and operative law. These contentions of the relator are based solely on the proposition that the initiative and referendum amendment to § 25 of the Constitution, by necessary implication, repealed, in whole or in part, § 67 of the Constitution, which provides: "No act of the legislative assembly shall take effect until July 1st, after the close of the session, unless in case of emergency (which shall be expressed in the preamble or body of the act) the legislative assembly shall, by a vote of two thirds of all the members present in each house, otherwise direct."

The opinions heretofore written by other members of this court are devoted almost exclusively to a discussion of the question of whether the emergency clause provided for by § 67 of the Constitution was impliedly repealed by the initiative and referendum amendment to § 25 of the Constitution. A careful consideration of the questions involved leads me to the conclusion that this question, while interesting, is not necessarily involved, nor is it necessarily determinative of the validity of the appointments of the respondents, and I express no opinion thereon.

I recognize the axiomatic principle of the American system of constitutional law, that the courts have inherent authority to determine whether statutes transcend the limits imposed by the Federal and state Constitutions, and that where a statute transgresses the authority vested in the legislature by the Constitution, it is not only the right, but the duty and sworn obligation, of the judiciary to declare such act unconstitutional and void. While judicial authority to determine the con-

stitutionality of legislative enactments has become a fundamental principle of our system of constitutional law, the rules by which the courts must be guided in determining such question are equally fundamental. The primary duty of the courts is to construe statutes with reference to the Constitution, and it is only when the Constitution is clearly violated by a provision of the statute that such provision may be declared unconstitutional. Escambia County v. Pilot Comrs. 52 Fla. 197, 120 Am. St. Rep. 196, 42 So. 697.

It is true the legislature in performing its duties is governed by and subject to the provisions of the Constitution, and may not do any act which the Constitution forbids. But it is equally true "that all governmental sovereign power is vested in the legislature, except such as is granted to the other departments of government, or expressly withheld from the legislature by constitutional restrictions." State ex rel. Standish v. Boucher, 3 N. D. 389, 21 L.R.A. 539, 56 N. W. 142.

"While it is a truism to say that the duty to enforce the Constitution is paramount and abiding," said White, Ch. J. (Wilson v. New, 243 U. S. 332, 61 L. ed. —, L.R.A.—, —, 37 Sup. Ct. Rep. 298), "*it is also true that the very highest of judicial duties is to give effect to the legislative will, and in doing so to scrupulously abstain from permitting subjects which are exclusively within the field of legislative discretion to influence our opinion or to control judgment.*"

For it is a fundamental rule of constitutional law that every presumption is in favor of the constitutionality of a statute enacted by a legislature. And this presumption becomes conclusive unless it is clearly shown that the enactment is prohibited by the state or Federal Constitution. State ex rel. Linde v. Taylor, 33 N. D. 76, 156 N. W. 564. A statute is not to be held a violation of the fundamental charter established by the people in their Constitution, unless so clearly outside the power conferred upon the legislature as to be free from reasonable doubt in that regard. It must be assumed that the legislature intended to act within its lawful bounds, and this assumption cannot be overthrown unless the statute unmistakably oversteps these bounds by manifest and plain terms. Accordingly, "it has been declared that in no doubtful case should the courts pronounce legislation to be contrary to the Constitution; that to doubt the constitutionality of a law is to resolve such doubt in favor of its validity; that all statutes are of constitutional

validity unless they are shown to be invalid; and that the courts will resolve every reasonable doubt in favor of the validity of the enactment." 6 R. C. L. § 98, "Constitutional Law." For it must be remembered that the members of the legislature and the governor are also required to take an oath to support the Constitution, and it is presumed that they have obeyed this oath, and have intended to comply with the provisions of the Constitution. 6 R. C. L. § 99. "Constitutional Law." And it has been said by a high authority that "great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." Missouri, K. & T. R. Co. v. May, 194 U. S. 267, 48 L. ed. 971, 24 Sup. Ct. Rep. 638.

In the case at bar the statute under consideration was adopted by the unanimous vote of all members of both branches of the legislature who were present and participated in the proceedings at the time when the votes were taken. The validity of the act or any of its provisions was never questioned. It is interesting to note in this connection that at least eight of the members of the house of representatives and eight of the senators who voted in favor of the Board of Regents Act were lawyers, and among such was one of the eminent counsel for the relator in this proceeding. Certainly, it cannot be assumed that any of these members voted in favor of the provision with a desire or intent either to violate or to evade the provisions of the Constitution.

The presumption of constitutionality applies with unusual force when the object of the legislative enactment is one peculiarly within legislative control. For "the legislature is given a large discretion in reference to the means it may employ to promote the general welfare. *It is for the legislature alone to judge what means are necessary and appropriate to accomplish an end which the Constitution makes legitimate.*" 6 R. C. L. p. 155. And where the legislature deals with a subject peculiarly within its sphere, courts should be "cautious about pressing the broad words of constitutional provisions to a drily logical extreme," and judges should be slow to read into constitutional provisions "*a nolumus mutare* as against the lawmaking power." Noble State Bank v. Haskell, 219 U. S. 104, 55 L. ed. 112, 114, 32 L.R.A.(N.S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487.

The question of whether the offices of members of the State Board of Regents should be created and how the incumbents thereof should be selected was concededly a political question, the determination of which rested solely with the legislature. This is not a case, therefore, where the legislature has sought to infringe upon either the executive or judicial departments, or legislate upon a matter forbidden by the Constitution. On the contrary the object of the legislation was one resting peculiarly within legislative discretion. The legislature declared by implication that the best interest of the state demanded that the various educational institutions be placed under the control of one joint board. It further declared that in its judgment the best way to select the members of such board was through nominations by the then executive, to be confirmed by the then sitting senate,—a procedure which is embodied in the Federal Constitution itself. These were purely legislative questions, and this court cannot say that the legislative judgment was wrong. Ibid.

In this state it is well settled that even the power to appoint to office is not necessarily an executive function, but is an attribute of sovereignty. And "all governmental sovereign power is vested in the legislature except such as is granted to the other departments of the government, or expressly withheld from the legislature by constitutional restrictions." State ex rel. Standish v. Boucher, 3 N. D. 389, 21 L.R.A. 539, 56 N. W. 142. And in absence of express constitutional restriction, an office created by the legislature is wholly under legislative control. Sinclair v. Young, 100 Va. 284, 40 S. E. 907; State ex rel. Moodie v. Bryan, 50 Fla. 293, 39 So. 929. And the legislative power to regulate and provide the manner of making original appointments to such office is absolute unless restrained by some constitutional provision. People v. Osborne, 7 Colo. 605, 4 Pac. 1074. See also State ex rel. Standish v. Boucher, supra. The legislature may make such appointment itself or confer the power to do so upon such persons or bodies as it in its wisdom sees fit to designate. Scholle v. State, 90 Md. 729, 50 L.R.A. 411, 46 Atl. 326; Cunningham v. Sprinkle, 124 N. C. 638, 33 S. E. 138; Sinking Fund Comrs. v. George, 104 Ky. 260, 84 Am. St. Rep. 454, 47 S. W. 779. This seems to be the universal rule under a Constitution like ours, where the executive is not given general appointing power. This principle was recognized by the

last legislative assembly and the present chief executive in the act providing for insurance of bank deposits (Senate Bill No. 217), as in this act the legislature provided that the appointive members of the Guaranty Fund Commission, including the original and all succeeding appointments, "whether to fill a vacancy or otherwise, shall be made by the governor" from a list of nine men, to be selected by the banks directly affected by the provisions of the act, said banks to be members of the corporation known as the "North Dakota Banker's Association." It will be noted that the appointive or selective power in the first instance is exercised by the banker's association, and the governor is restricted to a selection of three out of nine men designated by such association.

It has been held by the highest court in the land that no person has or acquires any vested interest or right in an office of which the legislative department may not deprive him, unless legislative action is prohibited by express constitutional restriction. Crenshaw v. United States, 134 U. S. 99, 33 L. ed. 825, 10 Sup. Ct. Rep. 431; Taylor v. Beckham, 178 U. S. 577, 44 L. ed. 1200, 20 Sup. Ct. Rep. 1009. Nor is there any constitutional restriction, state or Federal, upon the legislative power to enact retrospective legislation with respect to any matter contained in § 2 of the State Board of Regents Act. Satterlee v. Matthewson, 2 Pet. 380, 7 L. ed. 458; Watson v. Mercer, 8 Pet. 88, 8 L. ed. 876; Cooley (Cooley, Const. Lim. 6th ed. pp. 331, 332) says: "When an office is created by statute, it is wholly within the control of the legislature. . . . The term, the mode of appointment, and the compensation may be altered at pleasure, and the latter may be even taken away without abolishing the office."

It may be observed that the legislative power over appointment to statutory offices was announced by this court more than twenty years prior to the adoption of the initiative and referendum amendment to the Constitution, and the legislative records fail to disclose even a proposed change in the fundamental law to curtail or remove this power.

The statute under consideration was complete so far as legislative action was concerned. At the time the appointments were confirmed by the senate and the commission issued to respondents, every act required by the Constitution to be performed by the legislative assembly and by the governor of the state in the enactment of laws had been performed.

There was no way in which the governor or the legislature could destroy the piece of legislation which they had created, except by another enactment repealing the former act. And the only way in which it could be destroyed or its effectiveness retarded under the referendum provision of the Constitution was by affirmative action by the people. If no such action was taken, the act concededly would, and did, become fully effective and operative for all purposes on and after July 1st.

If the contentions of the attorney general are correct, the legislature has been shorn of power to designate a particular mode of appointment of a statutory officer in an act creating an office, unless the act of appointment is delayed until after July 1st; or the law is one for the immediate preservation of public peace, health, and safety, and a section so stating is contained in the law and adopted by a two-thirds vote of all members elected to each house, on a separate roll call.

It is suggested that the situation presented in this case may be obviated by the enactment of a general law giving the executive larger powers with respect to making appointments. This suggestion, however, implies a limitation upon the legislative power with respect to statutory offices heretofore unknown in this state. And it also presents the anomalous proposition that one legislature may by a general law in a degree bind a succeeding legislature with respect to a matter peculiarly within legislative control. It is doubtless proper for one legislature to adopt a general law to serve as a rule to be applied with respect to appointments to statutory offices in cases where no contrary expression is made by a succeeding legislature. This is to prevent chaos and uncertainty in the event the legislature which creates the office provides no mode of appointment. But it is, to say the least, a novel suggestion that one legislature may by general law provide for a mode of filling a statutory office which a succeeding legislature might create and which it, in absence of such general law, would be powerless to fill in the manner proposed by such general law, because of lack of authority to direct it to be done in that particular manner or at that particular time.

Even according to the attorney general's contention, however, the legislature could have provided that the appointments here involved be made in the manner designated in the act at any time after July 1st; or the governor could, under the terms of the act as it stands, have called

a special session of the legislature after July 1st, and submitted such appointments to the senate at that time, and if then confirmed the appointments so made would have been entirely valid. The sole complaint in that they were not made in a certain manner, or at a certain time. It is conceded that they could have been properly made in the manner in which they were made after July 1st; or that they could have been made at the time they were made if a different mode had been chosen. Can it be that the people intended to bring about such results by their adoption of the initiative and referendum amendment to the Constitution? I think not. And the legislative records furnish the most persuasive evidence that the framers of the initiative and referendum amendment had no such intent. These records show that upon every roll call taken upon the Board of Regents Act every member present in both houses voted in the affirmative. The records further show that a majority of the senators who voted for the act were members of the state senate during the 1913 session of the legislature, and voted upon the concurrent resolution providing for the initiative and referendum amendment.

If a construction would lead to an unreasonable result it is to be avoided if possible, for "a bad result suggests a wrong construction." People ex rel. Beaman v. Feitner, 168 N. Y. 360, 366, 61 N. E. 280. "In the construction of all laws we look to the old law, the mischief and the remedy . . . *no just rule of interpretation requires the court to go further, by applying the remedy to a case not within the mischief, unless the words of the law are too imperative to admit of construction.*" 4 Enc. U. S. Sup. Ct. Rep. 49.

It is the duty of the court to interpret, not to make, laws. Legislative enactments must be sustained and enforced unless they clearly contravene the provisions of the Constitution. While the question has not been argued, it seems to me there is some doubt if the court could eliminate the provisions assailed and sustain the remainder of the act. It is true that a statute may be constitutional in one part and unconstitutional in another part, and that if the invalid part is severable from the rest, the portion which is constitutional may stand, while that which is unconstitutional is stricken out and rejected; and if after eliminating the invalid portions, the remaining provisions are sufficient to be operative and accomplish the proper purposes, it does not neces-

-sarily follow that the whole act is void. This rule is nevertheless sub-
ject to the fundamental principle that the courts cannot constitute
themselves into a lawmaking body. And the question as to whether
the portions of a statute which are constitutional shall be upheld while
·other divisible portions are eliminated as unconstitutional is primarily
one of intention. And the constitutional provisions cannot be held
valid if it appears that they would not have been adopted without the
·other parts. 6 R. C. L. p. 124. As said by this court in McDermont
·v. Dinnie, 6 N. D. 278, 69 N. W. 294: "If the different portions of
the statute are so interwoven and interdependent that the rejected
portions furnish to an appreciable extent the consideration or induce-
ment for the passage of the act, then the entire enactment must be
rejected." The United States Supreme Court in discussing a similar
proposition in Poindexter v. Greenhow, 114 U. S. 270, 29 L. ed. 185,
5 Sup. Ct. Rep. 903, said: "It is undoubtedly true that there may be
·cases where one part of a statute may be enforced as constitutional, and
another be declared inoperative and void because unconstitutional; but
these are cases where the  .  .  .  court is able to see and to declare
that the intention of the legislature was that the part pronounced valid
should be enforceable, even though the other part should fail. *To hold
otherwise would be to substitute for the law intended by the legislature
one they may never have been willing by itself to enact.*"

The primary object in the construction of all statutory and consti-
tutional provisions is to ascertain and carry into effect the real purpose
for which they were adopted. The sole purpose of § 67 of the Con-
stitution was to secure a sufficient interval between the date of the pas-
sage of an act and its going into effect to enable the public to become
acquainted with its terms and conform thereto (State ex rel. Cummings
v. Trewhitt, 113 Tenn. 561, 82 S. W. 483), with the power reserved in
and granted to the legislature to put an act into immediate effect by a
two-thirds vote of all members present where an emergency exists.

This section merely fixed a date when a legislative enactment takes
·effect in the absence of a legislative declaration fixing some other date.
There is nothing in § 67 of the Constitution, however, to prevent the
legislature from fixing a date subsequent to July 1st for the act to
become operative. The legislature might make the act become opera-
tive at a considerable later date, or make the date of its becoming opera-

-tive depend upon a contingency. McPherson v. State, 174 Ind. 60, 31 L.R.A.(N.S.) 188, 90 N. E. 610; Foy v. Gardiner Water Dist. 98 Me. 82, 56 Atl. 201; Phœnix Ins. Co. v. Welch, 29 Kan. 672; 6 R. C. L. p. 167; 36 Cyc. 1201. And the legislature, unless prohibited by the Constitution, may direct that different parts of the same statute shall go into effect at different times. People v. Osborne, 7 Colo. 605, 4 Pac. 1074; State ex rel. Wheeler v. Stuht, 52 Neb. 209, 71 N. W. 941; 36 Cyc. 1201.

The referendum provision in the amendment to § 25 of the Constitution was merely intended to reserve to the people the power to refer and reject laws enacted by the legislature.

This power is reserved for the people itself in its sovereign capacity for the purpose stated, and must be invoked in the manner and within the time prescribed by the constitutional provisions reserving the power. It was not intended to take away any power theretofore vested in the legislature and place the same elsewhere.

It has been held that unless the referendum power is invoked within the time prescribed in the Constitution, "the right to have the same referred to the people for judgment" is lost, and it is then "too late thereafter to attack the emergency character of that act, either as to the vote thereon, or otherwise." Miami County v. Dayton, 92 Ohio St. 215, 110 N. E. 728.

In the case at bar the referendum power was not invoked, and the purpose for which such power was reserved is not involved.

Section 25 of the Constitution relates to legislative functions only. The same is true of the initiative and referendum amendment thereto. The amendment does not purport to reserve the power of initiative and referendum to any acts of the legislative assembly except such as are legislative in character. No one would contend for instance that an impeachment resolution adopted by the house of representatives, or a concurrent resolution for a legislative investigation adopted by both the house and the senate, or any act of that nature, would be subject to referendum. "Legislation as here contemplated," said Eakin, J., speaking for the supreme court of Oregon (Long v. Portland, 53 Or. 92, 98 Pac. 1112), "must be considered in the sense of general laws, namely, rules of civil conduct prescribed by the lawmaking power and of general application. By Opinion of Justices, 66 N. H. 629, 33

Atl. 1076, the law is said to be a rule,—not a *transient,* sudden order to and concerning a particular person, but something permanent, uniform, and universal."

While it is true that in this state the legislature has power not only to create statutory offices and prescribe the mode of appointment of incumbents thereof, but also to appoint such officers, it does not follow that the latter function is necessarily legislative in character, or must be exercised by formal legislative enactment. And it has been held that the appointment to office by a legislative body is not a legislative act to which the veto power of the chief executive extends. Erwin v. Jersey City, 60 N. J. L. 141, 64 Am. St. Rep. 584, 37 Atl. 732. See also Ogden City v. Bear Lake & River Waterworks & Irrig. Co. 28 Utah, 25, 76 Pac. 1069; Brazell v. Zeigler, 26 Okla. 826, 110 Pac. 1052; Globe v. Willis, 16 Ariz. 378, 146 Pac. 544.

The power to appoint is impressed with characteristics of an executive rather than that of a legislative nature. The power exists in the legislature, not necessarily because the act is legislative in character, but because the legislature possesses all governmental sovereign power except such as is granted to the other departments of the government, or expressly withheld from it by constitutional restrictions. As was well said by the supreme court of Wyoming: "The power of the executive and judicial departments is a grant, not a limitation, while the powers of the legislative department are absolute except as restricted and limited by the Constitution which the people have adopted. . . . This is elementary, and too familiar to need elaboration, that, while the judiciary and the executive have only enumerated powers, the sway of the legislative department is supreme, except as controlled by the limitations imposed by the organic law." State ex rel. Richardson v. Henderson, 4 Wyo. 535, 22 L.R.A. 751, 35 Pac. 520.

The principle was also clearly stated by this court in State ex rel. Standish v. Boucher, 3 N. D. 389, 396, 21 L.R.A. 539, 56 N. W. 142, where Mr. Chief Justice Wallin, speaking for the court, said: "Just at this point it may naturally be asked, since the power of the governor to appoint to office extends only to cases of vacancies not otherwise provided for, and since there is no express grant of appointing power in the Constitution to any other functionary or department of government, where does the power of appointment of officers and their successors in

office rest? The power to appoint to office is an attribute of sovereignty. All attributes of sovereignty essential to the administration of government must be vested in the several departments of government by the people; otherwise the government founded by the people would not constitute a full grant of governmental power. Such government would, to that extent, be defective, for the reason that the people themselves, in their collective capacity, exercise no governmental functions. Now, we have seen that the power to appoint to the offices in question is not vested by the Constitution in the governor. Neither is any appointing power vested in the judicial department, except to appoint certain court officials. Unless, therefore, this power resides in the legislature, it is lodged in no part of the government. As to this it will suffice to say that *all governmental sovereign power is vested in the legislature, except such as is granted to the other departments of the government, or expressly withheld from the legislature by constitutional restrictions.*"

I agree that a legislative enactment does not become effective as a rule of conduct until it has become a valid and existing law. But I do not agree that the legislature is powerless to incorporate in a legislative enactment provisions incident to the subject-matter of the legislation and require action to be taken under such provisions even before the act becomes operative as a law. For instance, where a statute by its terms is to become operative upon the happening of a contingency, such as the approval by a vote of the people, it frequently happens that the legislature in the very terms of the act prescribes the acts to be done, and it has been held that the provisions in such act will control where they conflict with other general statutes applicable to the same subject-matter. People ex rel. Brady v. La Salle Street Trust & Sav. Bank, 269 Ill. 518, 110 N. E. 38. It is true such acts are, in a measure, part of the process of legislation, but it is equally true that such proceedings rest in legislative discretion. So it is with the procedure outlined in the State Board of Regents Act for the appointment of the first members of the board. The legislature had power to make such appointment itself or to designate some other mode in which it could be made. Possessed of this power, it declared in plain and unmistakable language—that it desired to have the appointments of the first members of the board made prospectively by the then governor and confirmed

by the then sitting senate for the official terms appointed by the act, to commence on July 1st, 1915.

It has frequently been held by eminent courts that a prospective appointment to a new, or to fill a vacancy certain to occur in an existing, public office, made by a body which as then constituted is empowered to make such original appointment at the time the office comes into existence or to fill the vacancy when it arises, is, in absence of express law forbidding it, a valid appointment, vesting title in the appointee. State ex rel. Whitney v. Van Buskirk, 40 N. J. L. 463; People v. Blanding, 63 Cal. 333; State ex rel. Childs v. O'Leary, 64 Minn. 207, 66 N. W. 264; Oberhaus v. State, 173 Ala. 483, 55 So. 898. See also 29 Cyc. 1373; Mechem, Pub. Off. § 133; Stuhr v. Hoboken, 47 N. J. L. 147; Throop, Pub. Off. § 93; 23 Am. & Eng. Enc. Law, 347. In discussing this proposition in Oberhaus v. State, supra, the supreme court of Alabama said: "We have carefully examined the authorities on this proposition, and, as there is no material conflict among them, it is not necessary to here reproduce their language or reasoning. They clearly settle the law to the effect that the appointing power cannot forestall the rights and prerogatives of its own successor by appointing successors to officers whose official terms expire contemporaneously with or after the expiration of the term of the appointing power; *but where, by law or personal action, the office to be filled by appointment must become vacant by the expiration of the incumbent's term or by his withdrawal during the term of the appointing power, a prospective appointment thereto, if not forbidden by law, may be made at a convenient season before the actual expiration.*"

The American and English Encyclopedia of Law (23 Am. & Eng. Enc. Law, 2d ed. 347) states the rule as follows: "It is a common practice and undoubtedly proper for the appointing power, when the necessity for the exercise of the power is ascertained, to make appointments prior in time to that at which the term of office of the appointee is to begin, *where the appointing power of the officer or body making the appointment will continue until the term of the appointee is to begin.* Where, however, the appointing power of the officer or body making the appointment will expire before the term of office of its appointee will begin, and vest in its successors, it cannot forestall the

right and prerogative of its successors by making appointments to such
office."

The reason for the rule which forbids a prospective appointment,
obviously does not exist in this case. And it is a maxim of our juris-
prudence that "when the reason of a rule ceases, so should the rule it-
self." Comp. Laws 1913, § 7244.

That an officer may be lawfully nominated and elected to an office
not in existence at the time of such nomination or election was recog-
nized in this state in the acts creating the ninth and tenth judicial
districts; which acts provided that such districts should not come into
existence until the election and qualification of the judges thereof, such
judges to be chosen at the general election held in November, 1908 (see
Laws 1907, chaps. 161, 162). And this principle as embraced in these
laws received at least the tacit approval of this court in State ex rel.
Erickson v. Burr, 16 N. D. 581, 113 N. W. 705. Under these laws.
judicial candidates were nominated at the primaries held in June,
1908, and judicial candidates were voted upon at the general election
held in November, 1908, for, and elected to, judicial offices which were
not then in existence. The right to make prospective appointments has
frequently been recognized in this state, and was even recognized by the
present chief executive and the members of the present state senate, for
on March 2d, 1917, Governor Frazier nominated and the senate con-
firmed appointments for the offices of members of the state board of
control, such appointments to become effective and the terms of office
to commence on June 18th, 1917, and July 1st, 1917, respectively.
In fact the Board of Regents Act provides that all regular appoint-
ments of members of the board must be made and confirmed during the
session of the legislature preceding the commencement of the terms of
the respective members.

In the case of State ex rel. Thompson v. Winnett, 78 Neb. 379, 10
L.R.A.(N.S.) 157, 110 N. W. 1113, 15 Ann. Cas. 781, the supreme
court of Nebraska held that where an office is created by a constitutional
amendment, the legislature may properly permit the people to elect an
incumbent to fill such office at the same election at which the constitu-
tional amendment is submitted for adoption or rejection. In discussing
the question the court said: "It will be conceded that, where there is
no office, there can be no officer. Constitutions and amendments there-

to are created by the vote of the people, and not by a canvass of that vote, nor by the official declaration of the result. If this amendment was adopted, it was when a majority of the electors had voted in its favor, and, when that occurred, it became a part of the Constitution, and the office of state railway commissioners existed. By the same act of the people that made the amendment a part of the fundamental law, and created the office, these respondents were elected to fill that office. *Both matters might properly be submitted to the electors at the same election. This is in accord with universal precedent both in this and in other states.* The practice was introduced into this state by the 6th section of the enabling act." Comp. Stat. 1903, ¶ 114. Relator's counsel, however, contend that the principle announced by the Nebraska supreme court is based largely upon the practice introduced by the Enabling Act of that state, and consequently that this case is not applicable or of any value as authority in this state. An examination of the 6th section of the Enabling Act of Nebraska discloses that Congress expressly granted power to the Nebraska constitutional convention to submit the question of the adoption of the Constitution and the election of state officers at the same election.

It is true no such provision is contained in the Enabling Act of this state. The Enabling Act under which the North Dakota constitutional convention acted merely provided "that the constitutional conventions may, by ordinance, provide for the election of officers for full state governments, including members of the legislatures and representatives in the 51st Congress." Enabling Act, § 24.

But the North Dakota constitutional convention, even though no express authority was granted to it to do so, nevertheless provided that state officers, members of the legislature, and even clerks of the district courts in the various counties in the state be chosen at the same election at which the Constitution was submitted for approval or rejection. Schedule § 12. "Congress had no knowledge that any candidates for office would be voted for at the same election," at which the Constitution was submitted for ratification. There was as a matter of fact two separate elections, although both were held at the same time and utilized the same election machinery. One election was held to determine whether the proposed Constitution should be adopted or rejected; the other to select officers. The two elections were as distinct as if they

had been held upon two separate dates.   The votes cast for officers could not be taken into consideration in determining whether the Constitution or articles submitted separately had received a majority of the votes cast at the election.   State ex rel. Larabee v. Barnes, 3 N. D. 319, 55 N. W. 883.

The proposed Constitution could not have become effective for any purpose unless it had received the approval of the people.   It was merely a proposed law at the time it was submitted, and the election of officers would, of course, have been an absolute nullity if the Constitution had been rejected.   The constitutional convention was acting under, and called into being by, the Enabling Act.   It was acting under a grant of powers.   Wells v. Bain, 75 Pa. 39, 15 Am. Rep. 563.   The respondents were appointed under the terms of a legislative enactment which was complete so far as the legislature and governor were concerned.   No further affirmative act on the part of anyone was required. The provision under which respondents were appointed was enacted by a body whose powers were not dependent upon a grant, but whose powers were supreme and absolute, except as expressly withheld by constitutional restrictions.

I have carefully read and considered every case cited by relator's counsel.   It would serve no good purpose to discuss them and would unduly lengthen this opinion to do so.   No case cited presents a situation similar to that presented in this case.   Thus, Com. v. Fowler, 10 Mass. 290, presented a situation "where the legislature had created a new county and in the act had provided that it should not take effect until a future date mentioned."   And the question presented was whether the governor had authority to make an appointment prior to the time that the legislature had said that the statute should become operative, and by implication authorized the appointment to be made.   The same situation existed in the case of Opinion of Justices, 3 Gray, 606, and in State ex rel. Wolcott v. Kuhns, 4 Boyce (Del.) 416, 89 Atl. 1.   The same or an analogous state of facts was involved in practically every case cited.   Regardless of the soundness of these decisions, they are readily distinguishable from the situation presented in the case at bar.

Relator concedes that appointments could have been properly made at the time they were made provided the legislature had adopted a different mode of appointment; for instance, made the appointments it-

36 N. D.—27.

self in the body of the act; or that the appointments could have been legally made in the manner designated in the act, providing the appointment had been made by the governor, and confirmed by the senate at a later date; that is, after July 1st, 1915.

As already stated, relator's entire argument in this case is predicated on the assumption that the State Board of Regents Act did not become operative until July 1st, 1915, and that the offices of the members of the State Board of Regents would not come into existence until that day.

If this is true the offices of members of the State Board of Regents would become vacant or unoccupied on and after July 1st, 1915, and would so remain until incumbents were selected to occupy them. The governor could have called a special session of the legislature in July, 1915, and submitted the nominations of the respondents to the senate for confirmation, and the nominations so made and confirmed would have been entirely valid. Consequently, the appointments made in March, 1915, were made by the person and confirmed by the body which would be entitled to make such nominations and confirm such appointments in July, 1915, and the basic reasons upon which prospective appointments are justified clearly exist. For it has been said that the prime reason for permitting prospective appointments to fill an anticipated vacancy in a public office to be made by a person or body which as then constituted is empowered to fill the vacancy when it arises is based on "the supposition that there will be no change of person, and, consequently, of will, on the part of the appointing power between the date of the exercise of that power by anticipation and that of the necessity for the exercise of such power by the vacancy of the office." Mechem, Pub. Off. § 133. *In this case the respondents were appointed in March, 1915, by the person, and their appointments confirmed by the body, which as then constituted would have had the power to fill any vacancy which might have existed in such offices on July, 1915.*

If it is true, as argued by the attorney general, that the referendum power reserved in the people by the Constitution shears the legislature of all power to require performance of any act, regardless of its temporary or prospective nature, until a legislative enactment has received the passive approval of the people by the failure to file referendum petitions; then (assuming that the referendum power was intended to

apply to, and might be invoked upon, a provision relative to appointment of statutory officers as a separate item), it must follow as a corollary to the proposition stated and assumed that such approval when given operates as an approval of all the provisions of the act. For it must be remembered that the referendum may be invoked as to any "item or part" of any act. Consequently if the people had been dissatisfied with the provision relative to the appointment of the members of the State Board of Regents (assuming this provision to be subject to referendum as a separate item), they could have referred this provision and left the remainder of ·the act in force. By their failure to express disapproval of this provision (if relator's argument is sound), the people must be deemed to have approved this as well as the remaining provisions of the law, and the intent of the legislature as expressed therein also became the intent of the people as expressed by their approval.

It would seem that the most elementary principles of justice and common sense would require the application of the principle of relation, and that the approval when made, and the law when it became effective, should be deemed to relate back to the time when the appointments under the terms of the act were made.

The principle of relation is somewhat analogous to that which permits a lawmaking body to enact retrospective laws. As already stated there was no constitutional restriction upon legislative power to pass retrospective legislation with respect to the appointment of members of the State Board of Regents.

It is a rule of construction that statutes are to be construed as operating prospectively, unless the purpose and intention of the legislature to give them a retrospective effect is declared or implied from the language used.

This rule of construction, however, is merely based upon the presumption that the legislature intended to prescribe a rule for future operation only. The reason for the rule is that ordinarily it would be unjust to give a statute a retroactive construction. 36 Cyc. 1207, note.

The reason for the rule is at once apparent in construction of a general law affecting individuals and transactions generally. But the reason for the rule is not apparent in a situation involving purely public business. To whom could injury result from retrospective legisla-

tion with respect to the appointment of the first members of the Board of Regents? While it is true that the act under consideration is not couched in retrospective language, yet it is equally true that the legislature in plain and unmistakable language therein directed that certain acts be performed at certain specified times and in a certain manner. Ordinarily, the question of whether a statute is intended to be prospective or retrospective is important only in determining what acts the legislature intended to be within the operation of the statute. As already stated, the paramount rule of statutory construction is to ascertain and give effect to the legislative intent. Bearing this rule in mind, it seems to me that the principles of common sense and justice require that, as a law passed to take effect on a future day is to be construed as if passed on that day and ordered to take immediate effect, so should such law, if it contains directions that certain things be done prior to such time be construed as retrospective as to such acts, provided such acts are of a class where retrospective legislation may be enacted.

The principle of relation has been applied in a large variety of causes to carry into effect the legislative will and give effect to proceedings incomplete or abortive at the time the acts thereunder were performed.

It was applied by the supreme court of Maryland in Dyer v. Bayne, 54 Md. 87, in sustaining an appointment made by the governor, but not confirmed by the senate, within the period prescribed by the Constitution. The court said: "The efficient and only discretionary act of the governor in making the appointment was in making the nomination; and the senate having no other power over the nomination than to concur or nonconcur in it, the act of the governor became complete and effective with the concurrence of the senate, and *it related back to the time of the nomination*. The act of the senate and the subsequent ministerial act of the governor in issuing the commission *both related to the principal act of the governor in making the nomination,* the commission being evidence only of the appointment. And the appointment being thus allowed to speak as from the time of the principal act done in making it, all difficulty upon the terms of the Constitution is at once removed. *There can be no good reason why the principle of relation should not be applied* in a case like the present, as it is constantly applied in many others, for the advancement of justice, and to give full

and complete effect to legal proceedings. We think it should be so applied." The highest court in the land has held that "a subsequent recognization and adoption, by a legislative act, of an act done without previous authority, is a ratification of, and relates back to, the act done." United States v. Arredondo, 6 Pet. 691, 8 L. ed. 547. See also Re Van Vliet, 10 L.R.A. 451, 43 Fed. 761.

It has even been held that appointment of inferior governmental agents, made without authority of law, may be legalized by such legislative recognization and adoption. Wells v. Nickles, 104 U. S. 444, 26 L. ed. 825; Smith v. New York, 67 Barb. 223. See also State v. Evans, 161 Mo. 95, 84 Am. St. Rep. 669, 61 S. W. 594. This is in harmony with the views expressed by the supreme court of Ohio, in Miami County v. Dayton, 92 Ohio St. 215, 110 N. E. 726.

It seems clear to me that the provision contained in § 2 of the State Board of Regents Act, relative to the appointment of the first members of such board, does not contravene any limitations imposed upon the legislature by § 67, or the initiative and referendum amendment to § 25, of the Constitution.

In my opinion the respondents are holding their respective offices under valid appointments conferred upon them by the chosen representatives of the people in strict accord with the terms of the act under which the officers were created, and in a manner not forbidden by the Constitution. The writ should be denied.

BIRDZELL, J. (dissenting). The 14th legislative assembly during its session in 1915 passed an act known as the State Board of Regents Act, the same being chapter 237 of the Session Laws of 1915. The act was passed by the legislature on the 2d day of March, 1915, and was approved by the governor on March 4th, 1915. Under § 2 of the act the governor was empowered, and it was made his duty, on or before the 2d day of March, A. D., 1915, to nominate, and with the consent of the majority of the members of the senate in executive session to appoint, the members of the State Board of Regents for terms of two, four, and six years, reckoned from the first day of July, 1915.

The record of appointments kept by the governor in compliance with law shows that on March 2d the governor appointed as members of said board, Lewis F. Crawford, Frank White, J. D. Taylor, Emil

Scow, and J. A. Power, respondents herein. These appointments were messaged to the senate, then in session, on March 2d, 1915, were confirmed by the senate on March 5th, and on March 9th formal commissions or certificates of appointment were issued by the governor to the above-named respondents. Under these certificates the appointees were commissioned from March 9th, 1915, to the end of their respective terms.

During the session of the 15th legislative assembly in 1917, the governor nominated and messaged to the senate the names of the following as members of said board: W. G. Brown, Robert Muir, C. E. Vermilya, Roscoe Beighle, and George A. Totten, which nominations were rejected by the senate. After the adjournment of the 15th legislative assembly; to wit, on March 19th, 1917, the governor, having declared vacancies to exist in the above-mentioned offices, issued commissions or certificates of appointment to the last-named men, appointing them to fill such vacancies. This action having been brought on behalf of the state by the attorney general as relator, it is unnecessary to determine whether these appointments confer title. The sole question is as to the title of the respondents.

It is contended by the petitioner that the first appointments made under chapter 237 of the Session Laws of 1915 are insufficient to invest the appointees with title to the offices for the respective terms of their appointments, for the reason that, at the time the appointments were made, the act purporting to authorize the same had not become law. This contention is based upon a double premise.

First, it appearing from the governor's appointment register that the appointments were made on March 2d, and, it being an incontrovertible fact that the act did not become a law prior to March 4th, after which time no appointments were made, the records show conclusively that the appointments were made before the law went into effect. (For the purpose of this contention it might be assumed that the act became operative upon its approval by the governor.)

Second, that the emergency clause (§ 12) is insufficient, under the existing Constitution as amended, to put the law into operation before July 1st, 1915.

In fairness to the attorney general it should be stated at the outset that the argument upon the first premise was largely planned and made

STATE EX REL. LANGER v. CRAWFORD       423

in ignorance of the fact, of which there is no official record, that the commissions were issued to the respondents on March 9th, 1915, and that he became aware of this fact for the first time upon the argument of the case before this court. Since the argument upon the second premise is, in my opinion, quite conclusive against the title of the respondents, it is unnecessary to consider at length the merits of the argument upon the first proposition.

A careful reading of chapter 237 discloses that it was the evident intention of the legislature to make the act become effective and operative for all purposes, save for the purpose of the assumption of actual control over the institutions thereby brought under the jurisdiction of the Board of Regents, immediately upon its passage and approval. It is provided, for instance, that the governor shall make the appointments on the second day of March. It is further provided that the members of the board thus so appointed shall meet at the Capital on the first Tuesday in April, 1915, for the purpose of organizing and electing a secretary. The board is further authorized to procure the making of an educational survey "as soon as practical after having organized." They are to be paid $7 per day and their necessary traveling expenses while attending the meetings or while engaged in the performance of special duties, and to defray the expenses the sum $18,000 annually is appropriated. The emergency clause appended to the act is as follows: "Whereas, an emergency exists, in this, that this act is deemed of immediate importance in order that the board hereby created may be in a position to take full control of such institutions on July 1st, A. D. 1915, therefore this act shall be in full force and effect on and after its passage and approval." From this brief sketch of the provisions of the act in question, it clearly appears that the legislature did not intend or attempt to authorize or direct the doing of any acts in pursuance of the law prior to the time when, by its own terms, it should become operative. It clearly appears that it was the intention of the legislature to place the law into full effect and operation immediately, and that it was contemplated that it should in all respects be a law before anything was required to be done under it. This applies to the making of appointments as well as to the direction that meetings be held for purposes of organization and instituting the work directed to be done; for the history of the legislation discloses that, as the act was originally drawn,

the governor was directed to make the first appointments on February 21st, rather than on March 2d, the amendment substituting the latter date being made, no doubt, so as to place the time for making the appointments subsequent to the date when it was contemplated the act would probably pass. Without stopping at this point to inquire whether appointments made by the governor must be sanctioned by an existing law or whether they may find a sufficient legal foundation in acts to become operative at a later date, I shall pass to a consideration of the emergency clause, with a view to determining the date at which the law in question became operative.

The emergency clause was doubtless drafted with a view of satisfying § 67 of the Constitution. This section is as follows: "No act of the legislative assembly shall take effect until July first, after the close of the session, unless in case of emergency (which shall be expressed in the preamble or body of the act) the legislative assembly shall, by a vote of two thirds of all the members present in each house, otherwise direct." At the general election of 1914 certain amendments to the Constitution were enacted, among them being amendments authorizing the procedure known as initiative and referendum. The amendment with which we are concerned here was adopted as an amendment to § 25 of art. 2 of the original Constitution, which section contained but one sentence as follows: "The legislative power shall be vested in a senate and house of representatives." By the initiative and referendum amendment this section is so modified as to reserve to the people "power to propose laws and to enact or reject the same at the polls, *independent* of the legislative assembly." The portion of the amendment which is material to our present inquiry reads as follows: "The second power is the referendum, or the power to order *any act,* item, or part of any *act to be referred to the people for their approval or rejection at the* polls, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety), as to any measure or any parts, items or sections of any measures passed by the legislative assembly either by a petition signed by 10 per cent of the legal voters of the state from a majority of the counties, or by the legislative assembly, if a majority of the members elect vote therefor. *When it is necessary for the immediate preservation of the public peace, health or safety that a law shall become effective without delay, such necessity and*

*the facts creating the same shall be stated in one section of the bill,. and if upon aye and no vote in each house two thirds of all the members elected to each house shall vote on a separate roll call in favor of the said law going into instant operation for the immediate preservation of the public peace, health or safety, such law shall become operative upon. approval by the governor.*

"The *filing of a referendum petition* against one or more items, sections or parts of an act *shall not delay the remainder* of that act *from becoming operative.* Referendum petitions against measures passed by the legislative assembly shall be filed with the secretary of state not more than ninety days after the final adjournment of the session of the legislative assembly which passed the measure on which the referendum is demanded. *The veto power of the governor shall not extend to measures referred to the people.* All elections on measures referred to the people of the state shall be had at biennial regular elections, except as provision may be made by law for a special election or elections. *Any measure referred to the people shall take effect when it is approved by a majority of the votes cast thereon and not otherwise, and shall be in force from the date of the official declaration of the vote.*"

It is not seriously contended that the emergency clause upon the act in question is sufficient to satisfy the requirements of the amended § 25,. but it is earnestly argued that the amendment to § 25 in no way affects. the original § 67 of the Constitution, and that the emergency clause,. being sufficient under that section to place the law into immediate operation, is still sufficient notwithstanding the referendum amendment. In my opinion, this contention is wholly untenable, and certainly it is. not borne out by those courts which have had occasion to consider questions similar to, if not identical with, this.

The respondents' argument upon this point resolves to this: That since the adoption of the referendum amendment there are, with respect to time of taking effect, three classes of legislation; namely:

1st. Ordinary legislation, that will take effect on July 1st, after the adjournment of the legislative session.

2d. Emergency legislation, which may take effect under the provision of § 67 of the Constitution either immediately or remotely at such time as the legislature may determine.

3d. The class which is necessary for the immediate preservation of

the public peace, health, or safety, concerning which it is a requisite of its immediate operation that the necessity and the facts creating the same shall be stated in one section of the bill, that there shall be an aye and no vote in each house on a separate roll call upon the question of the emergency alone, and that the same shall pass by a two-thirds vote of all the members elected. This class might well be designated as real emergency legislation.

The first-mentioned class is clearly subject to the referendum, the last class just as clearly not subject thereto; whereas the applicability of the referendum amendment to the second class is, at least, gravely doubtful.

I am unable to find support either in reason or authority for such a classification of legislation under our present Constitution. The words of the amendment considered in the light of contemporaneous history leave no doubt in my mind as to the meaning to be derived therefrom. Under the Constitution as it stood prior to the referendum amendment, all legislative power was vested in the legislature. The scheme of government under that Constitution was representative only, and the legislative powers of the sovereign people were delegated exclusively to the representatives. By virtue of the amendment to § 25, a part of the legislative powers of the sovereign people was reserved for direct exercise by the people themselves, and a more or less elaborate scheme was provided for giving effect to this power *"independent"* of the legislative assembly as the people should choose to exercise it. The referendum power is defined in the amendment itself to be "the power to order any act, item, or part of any act to be referred to the people for their approval or rejection," and it is provided that the filing of a referendum petition "shall not delay the remainder of that act from *becoming operative,"* and that any measure referred to the people "shall take effect when it is approved by a majority of the votes cast thereon and *not otherwise,* and shall be in force from the date of the official declaration of the vote." From the foregoing language it would seem to be clear that the referendum powers of the people were not to be employed as to legislation which had already taken effect, but rather that there should be an opportunity for the exercise of the referendum before any act of the legislature subject to such power should become a law at all. Nowhere within the four corners of the amendment is there

any expression that tends, in my opinion, to evince an intention on the part of its framers to make the referendum powers extend to legislation which has once become operative. To give the amendment a construction which would change the nature of the power reserved, from that of a referendum upon legislation in process of making to that of a repeal of legislation recently put into force, is to change the very nature of the power itself. The referendum is not designed as a mere potential condition subsequent or as a repealing power; it is rather a right to say that certain acts shall or shall not *become* law at all. Such a construction as would make immediately operative an act passed by the legislature with an emergency clause attached satisfying § 67 of the original Constitution, subject, however, to being suspended by the later filing of a referendum petition against it, would, indeed, lead to some very startling and shocking results, and would introduce into the legislative system the condition frowned upon by our highest judicial authority. The United States Supreme Court has employed language which aptly characterizes the condition that would result from such a practice. In speaking of a somewhat similar situation it said: "That which purports to be a law of the state is a law, or it is not a law, according as the truth of the fact may be, and not according to the shifting circumstances of parties. It would be an intolerable state of things if a document purporting to be an act of the legislature could thus be a law in one case and for one party, and not a law in another case and for another party; a law *to-day* and not a law *to-morrow;* a law in one place and not a law in another in the same state." South Ottawa v. Perkins, 94 U. S. 260, 24 L. ed. 154.

In this connection it should further be noted that to hold legislation that is passed with the emergency clause provided for in § 67 immediately effective, and yet subject to later suspension by referendum, would make it possible to defeat entirely the effect of a referendum upon all legislation for the accomplishment of some object which could be fully realized within a short time. There need be no emergency in fact, and the public peace, health, or safety need not be involved,—all that would be required would be a two-thirds vote of the members present, which may be no more than the bare majority required for passage. Under this construction the reserved referendum powers would, as to such legislation, become a mere empty shell and their exercise be but an idle

ceremony.   The researches I have been able to make have not been
rewarded by the finding of the slightest authority for the position that
legislation passed with the old-style emergency clause goes into effect
immediately, subject to the later exercise of the referendum.   On the
contrary, as will be noted later, every expression is against the proposi-
tion.   (See authorities hereinafter cited.)

In construing the amendment in question we must not lose sight of
the fundamental principle that should control in every effort to derive
from the Constitution as amended its true meaning.   We should be
ever mindful that it is of supreme importance to ascertain and to apply
the meaning which reasonably inheres in the original Constitution, with
due allowance for that which is conveyed by more recent amendments.
In giving effect to an amendment construed in the light of the previous-
ly existing provisions of the Constitution it must be remembered that
both are expressions of the fundamental law.   Such a construction must
not be given to the Constitution as a whole as will tend to set at naught
the basic policy underlying an amendment.   The proper rule of con-
struction to be applied in such a case was well expressed by the court of
appeals of New York as follows: "The question remains whether the
framers of the amendment intended that a general provision contained
in the original instrument should be applicable to the subject of such
amendment.   It would be quite absurd to suppose that, while framing
an elaborate scheme of public policy to be incorporated in the funda-
mental law of the state, they intended to subject it to the operation of
general provisions of the same instrument which might, when applied
thereto, annul the express grants of power therein contained, and au-
thorize each successive legislature to overthrow and destroy the whole
object and effect of the amendment adopted.   To hold that this was the
intention of the authors of the amendment would require us not only to
stultify them, but would stamp their work as an idle ceremony of no
practical importance."   People ex rel. Killeen v. Angle, 109 N. Y. 564–
574, 17 N. E. 413.   See also People ex rel. Williams Engineering &
Contracting Co. v. Metz, 193 N. Y. 148–156, 24 L.R.A.(N.S.) 201, 85
N. E. 1071; People ex rel. Carlson v. Denver, 60 Colo. 370, 153 Pac.
690; People ex rel. Atty. Gen. v. Cassiday, 50 Colo. 503, 117 Pac. 362;
Hodges v. Dawdy, 104 Ark. 583, 149 S. W. 659; Grant v. Hardage,
106 Ark. 506, 153 S. W. 826. - A fair construction of the Constitution

and the amendment, with a due regard for the foregoing principle, requires that any inconsistency between the emergency clauses of § 67 of the Constitution and of the referendum amendment to § 25 shall be resolved in favor of the later expression found in the amendment. To construe it otherwise would be to lay foundations which might ultimately lead to the complete destruction of the vital principle of the amendment and to the complete denial of the reserved power therein contained. A construction in harmony with this principle has been adopted by the district court of appeals of the 3d district of California. The court said: "This amendment to the Constitution provides a scheme for the exercise of what is known as the initiative and referendum, and, of course, if possible, the language should be construed so as to make effective this reservation of power on the part of the people. It was clearly their purpose, except where the exigency of the public service demanded otherwise, that no legislative enactment should become operative until an opportunity were afforded the people to express their judgment as to the merits of the measure. The time within which a petition may be presented in contemplation of this action by the people is limited to ninety days after the adjournment of the legislature, and hence the manifest propriety of suspending for said period the operation of any measure that should be thus reviewed.

"The exceptions provided are ample enough to prevent any menace to the public welfare by reason of such delay incidental to a submission to popular vote, and they should not be given an interpretation so elastic as virtually to circumvent and nullify the will of the people so solemnly expressed in said constitutional provision." McClure v. Nye, 22 Cal. App. 248, 133 Pac. 1147.

But without regard to the general policy of the amendment, its language alone is a sufficient guide to its meaning touching this question. A number of expressions might be referred to to substantiate this statement, but one will suffice. Coupled with the expression which reserves the right of referendum is an express exception which precludes its application to "laws necessary for the immediate preservation of the public peace, health, or safety." The next sentence deals exclusively with the legislative procedure that shall be required to put the excepted class of legislation into immediate operation, and it is provided that upon satisfying these requirements "such law shall become operative upon

approval by the governor." Had the framers of the amendment considered that section 67 would continue wholly operative to accomplish this purpose, the concluding clause of this sentence would not have been expressed as it was, if, indeed, the sentence would have been regarded as necessary at all.

Upon this question, however, there is an abundance of authority. A number of the courts have had occasion to consider it, and it has been uniformly held that, since the adoption of the referendum amendment containing the specific exception as to legislation that should not be subject thereto, and as to the character and form of the emergency required to remove an act from the operation of the referendum, an emergency clause complying with the original constitutional provisions similar to our § 67 could not operate to put a law into immediate effect. It is true that the supreme court of South Dakota in the case of State ex rel. Lavin v. Bacon, 14 S. D. 394, 85 N. W. 605, in an ill-considered opinion, held that an act could become immediately effective under the original constitutional provision respecting emergencies, notwithstanding the referendum amendment. But in a later case, State ex rel. Richards v. Whisman, 36 S. D. 260, L.R.A.1917B, 1, 154 N. W. 707, this holding was repudiated. The learned court in an unanimous opinion by presiding Justice McCoy held that "§§ 1 and 22 of article 3 should be construed and read together as if forming different parts of but one section," and that "the emergency measures mentioned in § 22 must and can only refer to the same emergency measures mentioned in the referendum clause exception contained in § 1." "*It therefore follows,*" said the court, "*that the legislature, by necessary implication, is only authorized to declare emergencies in that class of measures specified in the said exception to the referendum clause.* As to all emergency measures and acts within the purview of this exception, the legislature may declare an emergency to exist. . . . *But as to any measure, law, or enactment clearly not within the class of emergency measures specified within said exception, the legislature has no power or authority to declare an emergency to exist in relation thereto, by any vote, however large the same may be; and the action of the legislature in embodying emergency clauses in measures clearly not comprehended within the said exception is wholly unwarranted and void, and should be so held by the courts. Not that the act itself would be void, but the emergency*

*clause would be void, with the result that the act would not go into effect until the first day of the next July, and also with the result that, in the event of a proper referendum* petition being filed as required by law, such enactment would not go into effect until approved by a majority vote of the electors of the state." State ex rel. Richards v. Whisman, supra. This case involved the effect of an emergency clause similar to the one upon the act in question.

It clearly appears from the foregoing expression that the *dicta* of Justice Corson in the case of State ex rel. Lavin v. Bacon, supra, wherein he held both that the old emergency provision was still effective and that legislation containing an emergency clause satisfying this provision would not be subject to the referendum, are distinctly overruled by the more recent unanimous expression of the same court. I say *"dicta"* because it appears that the court had before it in the first case an emergency clause declaring that the act was necessary for the immediate preservation and support of existing public institutions, which declaration brought the emergency within the exception contained in § 1, and by this alone it was removed from the operation of the referendum and given immediate effect. S. D. Const. art. 3, § 1.

Arkansas Tax Commission v. Moore, 103 Ark. 48, 145 S. W. 199, is in complete accord with the later South Dakota case. In this case the court passed upon an act of the general assembly of Arkansas which contained an emergency clause similar to that formerly in vogue in this state under § 67 of the Constitution. The clause simply provided that the act should take effect and be in force from and after its passage. The act was approved by the governor on June 29th, 1911. The court held that, under the initiative and referendum amendment *"only 'laws* necessary for the immediate preservation of the public peace, health, and safety' are excepted from its provisions," and that "all other laws are subject to its operation; and ninety days being given by its terms from the final adjournment of the session of the legislature which passed them, in which to demand or order the referendum thereon, *they cannot take effect or go into operation until the expiration of ninety days after such adjournment."* In this case, as in the instant case, there were acts to be done by certain state officers within the ninety days period, and it was held that this fact would not render the act operative for any purpose before the expiration of the period within which the referen-

·dum might have been exercised. See also Hanson v. Hodges, 109 Ark. 479, 160 S. W. 395, and Cooley, Const. Lim. 7th ed. pp. 92 and 224.

In Sears v. Multnomah County, 49 Or. 42, 88 Pac. 522, the supreme ·court of Oregon had occasion to consider a similar question, and it like-wise held ineffective an emergency clause which would have been suf-ficient under the section of the Constitution of Oregon which corre-sponds with our § 67. The Oregon court refused to follow the earlier decision of the South Dakota court in State ex rel. Lavin v. Bacon, 14 S. D. 394, 85 N. W. 605, and held that, after the adoption of the refer-endum amendment, the only emergency clause which could operate to put a law into immediate effect would be one coming within the terms ·of the referendum exception. It was accordingly held that the act in question would not become effective until ninety days after approval by the governor, notwithstanding it bore an emergency clause which would have carried it into immediate effect under the Constitution as it or-iginally stood. In this case the question was squarely presented, and the court was unanimous.

In the case of State ex rel. Brislawn v. Meath, 84 Wash. 302, 147 Pac. 11, the supreme court of Washington decided, in accordance with the cases, previously cited, from South Dakota, Arkansas, and Oregon, that since the adoption of the referendum amendment an emergency clause complying only with the original Constitution would not be ef-fective to carry the law into immediate operation. In that case an act was passed changing the personnel of the state board of land commis-sioners. An emergency clause was attached, stating that the act was nec-essary for the.immediate preservation of the public peace and safety and for the support of the state government, wherefore it should take effect immediately. While there was a marked difference of opinion among the judges as to the propriety of going back of this legislative declara-tion of an emergency, the court seemed to be agreed that the law could not go into immediate operation save on the assumption that there had been a full compliance with the referendum emergency exception.

In the case of State ex rel. Kemper v. Carter, 257 Mo. 52, 165 S. W. 773, the supreme court of Missouri construed a referendum amend-ment which was substantially identical with that of Oregon and Ar-kansas (which is also substantially the·amendment adopted in this .state). In that case the referendum had been invoked, but the court, in

determining whether or not the act referred was in effect prior to the election, approved and adopted the interpretations of the courts of Arkansas and Oregon above referred to. See also Re Menefee, 22 Okla. 365, 97 Pac. 1018; Norris v. Cross, 25 Okla. 287, 105 Pac. 1000; Kadderly v. Portland, 44 Or. 118, 74 Pac. 720, 75 Pac. 222; Atty. Gen. ex rel. Barbour v. Lindsay, 178 Mich. 524, 145 N. W. 98.

I am aware of the fact that the Constitutions of some of the states from which the foregoing cases are cited differ in some respects from the Constitution of North Dakota as amended, but in none of the cases summarized above has any conclusion been based upon language not found in our Constitution. It is true, nevertheless, that in Washington and California the decisions might have been rested upon the express language of the referendum amendment wherein it is provided that no law or bill subject to the referendum shall take effect until ninety days after the adjournment of the session of the legislature at which it was enacted. In South Dakota the referendum amendment contains a clause not found in the North Dakota amendment, which clause is italicized in the following quotation. There the referendum is declared to be the right to require that the 'laws . . . shall be submitted to a vote of the electors of the state *before going into effect* (except such laws as may be necessary for the immediate preservation of the public peace, etc.)." This amendment is no more explicit than the North Dakota amendment as to what the effect shall be where the right of referendum is not invoked, nor was the italicized portion in any way relied upon by the South Dakota court in its interpretation of the language of the amendment to the effect hereinbefore indicated.

In Arkansas the referendum amendment differs in no substantial particular from that of North Dakota, but in the Arkansas Constitution there is no section which corresponds with § 67 of the North Dakota Constitution. In the absence of such a controlling provision in the Constitution the time when laws shall take effect is under the complete control of the legislature. This was the situation under the Constitution of Arkansas prior to the amendment; yet, the court held that by the adoption of an amendment like ours the legislature was deprived of the power, previously vested in it, to make its acts effective at such time as it should choose. In both Oregon and Missouri, however, the situation is identical with that of North Dakota. The original Constitu-

36 N. D.—28.

tions in these states contained sections which controlled the time when laws should become operative, and authorized the legislature to make them take effect at a different time by the adoption of an emergency clause, and those sections remain in the original Constitutions, modified only by the referendum amendment, as in North Dakota.

It is difficult to see wherein the fact that the Oregon section corresponding with § 67 of the North Dakota Constitution does not require a two-thirds vote is a consideration weighing in favor of the conclusion reached in the opinion of Chief Justice Bruce. In both North Dakota and Oregon the requirement to satisfy the emergency clause of the referendum amendment is more exacting and rigid than that of the original emergency limitation. As pointed out elsewhere in this opinion, a bare majority of the members elected may be sufficient to attach the emergency clause provided for by § 67.

It is equally difficult to see wherein a resort to the aid of contemporaneous construction is at all proper in the instant case. It must be borne in mind that the legislature of 1915 was the first to meet after the adoption of the referendum amendment, and it is a fact worthy of note in this connection that the newspapers which told of the conclusion of the session also published an opinion of the attorney general of the state holding that the only acts which could become immediately operative were those which were necessary for the immediate preservation of the public peace, health, or safety, and those only in case an emergency clause had been attached in compliance with the referendum amendment. The headlines and subheadlines of the newspapers make it appear that even the lawyers in the legislature were, to quote from them, "asleep at the switch," and that the house of representatives was "taken by surprise." In the face of these facts, contemporaneous construction is certainly of no weight whatever. Furthermore, it is a fact equally well-known and of even greater significance that at the session immediately following the legislature changed its practice so as to conform to the requirements of the referendum amendment.

This branch of the discussion has extended beyond the bounds that would seem to be required to express a personal or minority view. But inasmuch as four members of this court regard the question as properly involved,—at least three members regarding it as decisive,—it was thought proper to attempt a fairly ample expression of the views of a

minority of the court in the hope that they may yet prevail when the full court is called upon in some future case to determine the question.

Having determined that the emergency clause appended to the act in question is wholly insufficient to put the act into immediate operation upon its approval, and that the act consequently could not, and did not, take effect as a law of the state during the period allowed for filing a referendum petition, it remains to consider whether or not the action taken by the governor in appointing the respondents to membership on the Board of Regents for the respective terms indicated in the certificates of appointment conferred upon them any title to the offices so occupied. Respondents contend that it is legally competent for the chief executive to make an appointment to a new office to take effect on the establishment of such office, which appointment might legally be made before the law establishing such office should go into effect. The validity of this contention depends upon the state of the law controlling the exercise of the appointing power.

Early in its history, this court had occasion to consider and to define the powers of the governor with reference to appointing minor officers, and it was held that the governor possessed no inherent powers of appointment as a prerogative of his office. Said the court on that occasion, speaking through Mr. Justice Wallin: "We do not think that all power to appoint to office resides with the governor of a state as an implied executive function in cases where the Constitution is silent upon the question. This view is in harmony with the spirit of our institutions and has the support of a decided preponderance of authority."

"Under the common law of England the sovereign power belonged to the King, and the power to appoint to office was unquestionably a sovereign prerogative. In this country, and under our form of government, the sovereign has been transferred and is in the hands of the people." State ex rel. Standish v. Boucher, 3 N. D. 389–395, 21 L.R.A. 539, 56 N. W. 142.

Again, after a full discussion of the authorities, Justice Bartholomew stated the following as his conclusion: "A careful study of all authorities to which we have been cited and all that we are able to find has made it entirely clear to each member of this court that the power of appointment to office does not necessarily and in all cases inhere in the executive department, and that when, as in this state, the express pro-

vision of the Constitution vest in the governor a limited power of appointment, *such grant is exclusive, and no other or greater appointing power can be exercised."* State ex rel. Standish v. Boucher, supra, 409.

Since this original pronouncement it has been the unquestioned law of this jurisdiction that the exercise of a power of appointment by the governor must find sanction in some positive law, and that it cannot rest alone upon official prerogative or upon implications of power to be derived from the Constitution.

Such being the law as heretofore determined by this court, we must look to the Constitution and the statutes in order to determine what appointive power has been given to the chief executive. Section 78 of the Constitution is as follows: "When any office shall from any cause become vacant, and no mode is provided by the Constitution or law for filling such vacancy, the governor shall have power to fill such vacancy by appointment." Section 111, subd. 3, Compiled Laws of 1913, in speaking of the powers of the governor "in addition to those prescribed by the Constitution," says: "He is to make appointments and fill vacancies as required by law." Section 683 of the Compiled Laws of 1913 is a general statute declaring when offices shall be deemed vacant, and § 696 of the Compiled Laws of 1913 provides that all vacancies in state offices shall be filed, with certain exceptions, by the governor. In these sections of the Constitution and the statutes, together with the authoritative judicial interpretation of the powers of the governor, we have a complete body of law controlling the exercise of the appointive power by the governor, and this law must control until authoritatively, effectually, and legally changed.

It is no more competent for a legislature to effect a change in this body of law before the time arrives when it is constitutionally competent for it to have its will given the force of legal expression, than it would be for a majority of the legislature to attempt at its next session to reduce the number of votes required in the senate for the confirmation of a member of the board of control from two thirds, as now required, to a majority. Manifestly any attempt to so change the law where no emergency exists or is declared would be wholly abortive; yet it would be exactly within the logic of the opinion of Mr. Justice Christianson, wherein he justifies the legality of the appointments of the respondents on the theory of legislative intention. In my opinion, the validity of the ap-

pointments of the respondents must depend upon the existence or non-existence of a law in force at the time the appointments were made, which would justify and warrant the exercise of the appointing power. As we have before seen, there was no law in effect on March 5th, when the appointments were confirmed by the senate, or on March 9th, when the commissions were issued by the governor. This being true, the appointments lacked legal sanction when made, and were consequently incapable of conveying title to office. State ex rel. Worrell v. Peelle, 124 Ind. 515, 8 L.R.A. 228, 24 N. E. 440; State ex rel. Harvey v. Wright, 251 Mo. 325, 158 S. W. 829, Ann. Cas. 1915A, 588.

One of the leading cases cited by respondents in support of the argument that it is competent for the executive and the senate to make prospective appointments under a prospective law is the case of People ex rel. Graham v. Inglis, 161 Ill. 256, 43 N. E. 1103, wherein it was held that appointments made by the governor before the time when the law passed by the legislature became effective conveyed good title to the office. The court, however, rested the case principally upon the construction of a provision of the Illinois Constitution which provided that every bill passed by "the general assembly shall, before it becomes a law, be presented to the governor. If he approves, he shall sign it, and *thereupon* it shall become a law." The court adopted the view that the law existed from the date of approval, and that it was only its operation that was postponed. It must be noted, however, that the court rested the exercise of the appointing power, which was sustained in that case, upon a separate section of the Constitution, which provided that the governor should nominate, and, by and with the consent of the senate, appoint, all officers whose terms are provided for by the Constitution or which may be appointed by law. The court did not hold that the act, which had not as yet gone into operation, was, standing alone, a sufficient warrant for the exercise of the appointive power of the governor. This distinction was observed and commented upon soon afterward by the same court in the case of People ex rel. Herdman v. Rose, 166 Ill. 422, 47 N. E. 64. In this later case there was involved the question of the validity of an election directed to be held in June under an act which, it was contended, did not become effective until July first. In drawing the distinction mentioned above, the learned court used language that expresses the principle which differentiates the two situa-

tions more adequately than any we might employ. "Upon this question," said the court, "the attorney general, as counsel for the defendant, contends that although the law may not be in force, such election may be held under its provisions, and he cites the case of People ex rel. Graham v. Inglis, supra, to sustain his claim. That case does not furnish a parallel to this. The governor who exercised the power of appointment of trustees of the normal school was an officer of the state, *vested by the Constitution with the power of appointment, which he exercised.* His office was created by the Constitution, and his power of appointment *did not depend upon the law or upon its being in force at the time.* It was there said that the trustees whose power arose out of the act not yet in force could do nothing to carry out its provisions until the law should take effect. In this case the law creates new districts and a new electorate, upon which the power of choosing judges in the respective circuits is conferred. The circuits in which the elections are to occur have no existence, *except as they are created by the act.* The only purpose of the law is to make new circuits, and to make it effective for that purpose is to make it effective for the entire object of the law. Unless the act is in force, the new circuits in which conventions can be held and nominations made, and elections called and held, can have no existence."

In the case of State ex rel. Wolcott v. Kuhns, 4 Boyce (Del.) 416, 89 Atl. 1, the superior court of Delaware denied the authority of the Inglis Case for the proposition that an appointment could be made under a prospective law, and that court likewise pointed out that the power of appointment which was upheld in the Inglis Case rested in reality upon a provision of the Constitution which made the governor the appointing power for all offices created by statute. Then the court proceeded to hold void an appointment made by the governor six days prior to the time when the act authorizing the appointments went into effect. In distinguishing between the case at bar and the Inglis case, the court said: "That case is no aid to us in this case for the *appointment here was made under authority of the same statute that created the office, and the power of appointment is coexistent with the creation of the office.* The question then is, When was the office created and when was the power of appointment conferred upon the

governor? Upon the date of the approval of the act, or upon the date that by its own terms it took effect?"

In the solution of this question, which is the same as in the case before us, the Delaware court relied upon no less an authority than Mr. Justice Shaw of the supreme court of Massachusetts, and adopted language from an opinion contained in the supplement to Opinion of Justices, 3 Gray, 601–607, which I should be perfectly content to adopt and follow in the instant case. Said Chief Justice Shaw: "Every provision and clause of the act, whether it be for making any new law, or for repealing, qualifying, or amending any old one, are absolutely suspended until the arrival of the time limited for its going into operation, to the same effect and purpose as if it had been passed on that day. If such an act confers powers on the governor and council to appoint officers, or on the legislature or people to elect them, such powers do not become vested in such magistrates or people until the day limited for the act to go into operation." See also Com. v. Fowler, 10 Mass. 290; State ex rel. Cook v. Meares, 116 N. C. 582, 21 S. E. 973, State ex rel. Worrell v. Peelle, 124 Ind. 515, 8 L.R.A. 228, 24 N. E. 440; Santa Cruz Water Co. v. Kron, 74 Cal. 222, 15 Pac. 772; Harrison v. Colgan, 148 Cal. 69, 82 Pac. 674; Rice v. Ruddiman, 10 Mich. 125.

Respondents rely upon the case of State ex rel. Clarke v. Irwin, 5 Nev. 111, to substantiate their contention that an appointment to a new office, to take effect at a future date when the act creating the office should go into effect, is a good appointment. It appears in that case that the respondent Irwin was designated in the act itself as sheriff. It also appears that between the date of the passage and the date fixed in the act for it to take effect, Irwin was commissioned by the governor. The case nowhere holds that the commission by the governor alone was sufficient to invest Irwin with title to the office. On the contrary, the clear implication of the decision is that such commission was not sufficient to vest the title in him; for it was held, in accordance with the principle later established in this state in the Boucher Case, that the power of the governor to appoint to office was, under the constitution of Nevada, as here, but a limited appointive power,—that of filling vacancies where no other method is provided by law. That such is the holding of the Nevada court clearly appears

from the following quotation at page 128: "Two things must then concur; there must be a vacancy, and no provision made by the Constitution, or no *existent* law for filling the same, before the governor can exercise the appointing power. Now, if, upon the creation of this new office, . . . no vacancy occurred, the office remained to be filled by some power. *The governor had not that power,* and there was no prohibition upon the legislature, unless it exist in the constitutional provisions heretofore considered, . . . If there was a vacancy, then the very law which created the county and occasioned the vacancy filled the same, and there was no such condition of affairs as § 8, art. 5 [the section authorizing the governor to make appointments to fill vacancies] of the Constitution suggests; but upon this latter point it is unnecessary to express a decided opinion, for Irwin had not only the appointment of the legislature, but the commission of the governor." See also State ex rel. Rosenstock v. Swift, 11 Nev. 128–137, 138.

It will be noted that the section in Throop on Public Officers, relied upon by respondents (§ 91), contains a very proper qualification which destroys its effect as authority for the proposition contended for in this case. The statement is: "As a general rule, a prospective appointment made by a *body* which, *as then constituted,* has power to fill a *vacancy* when it arises, is valid. So an appointment, to take effect at a future day, when the statute creating the office shall take effect, is good." This latter statement no doubt presupposes the existence of the power to appoint at the time of its exercise. The only authority cited for it is the Nevada case of State ex rel. Clarke v. Irwin, supra, in which the court expressly refused to hold that the appointment by the governor alone was sufficient to invest the respondents with title, and where, as shown above, the court adheres to the theory of the limited appointive power of the executive, which must find its sanction in some *"existent"* law. Professor Mechem, in his work on Public Officers, states the rule substantially as stated by Throop, making proper allowance for the application of the limited power of appointment in the executive. Says Mechem, § 133: "A prospective appointment to fill an anticipated vacancy in a public office, made by the person or body which, *as then constituted* [the italics are Mechem's] is empowered to fill a vacancy when it arises, is, in the absence of express law forbidding it, a legal appointment, and vests title to the office in the appointee." Neither

of these authorities goes any farther than to justify the exercise of the vacancy-filling power of the governor when it is certain that a vacancy will occur at a future date. This is altogether different from the power to fill an office for a definite term extending beyond the period to which vacancy appointments are legally limited. Under the act in question a vacancy appointment is limited to expire at the next session of the legislature following the appointment. Sess. Laws 1915, chap. 237, § 3.

Upon the supposition that a newly created office, which has never had an incumbent and which no one has been legally authorized to assume, can be deemed vacant so as to call into being the vacancy-filling power of the governor (as to which the authorities are in sharp conflict, Mechem, Pub. Off. § 132), the appointments made, designating the respondents as members of the Board of Regents, could have no effect other than that of ordinary vacancy appointments by the governor. Certainly a new office is not regarded as vacant for the whole term under the law of this state. Comp. Laws 1913, § 683. A vacancy appointment expires at the time limited by law, even though no successor has been appointed. See Mechem, Pub. Off. § 139.

If valid appointments can be made before the law conferring power to make them can become effective, what else may be done? Might a board legally enter into a contract before the law authorizing them to do so could become effective? Would a contract so made be binding, so that its obligation could not be impaired? Could a mere majority of the legislature authorize money to be drawn from the state treasury in any year of a legislative session before the law appropriating it goes into effect? Certainly a majority could put any such provision into a bill and could pass it, although it might lack the necessary vote to make the bill effective as an emergency matter. The subject-matter itself might even be wholly inappropriate for an emergency. The opinions of Justices Bruce and Christianson go a long way towards denying the effect of the plain language of our Constitution. Of what force is the constitutional provision postponing the effect of legislation if, where no emergency exists, officers may be inducted into office under commissions to hold six years, which commissions are issued before the law goes into effect, and by an officer whose legal power to appoint is limited by express law to the filling of vacancies? If such appoint-

ments convey title to office, by what process of reasoning will we withhold the exercise of the governmental franchise in other directions and to what extent will we deny effect to laws adopted in the face of the Constitution withholding the operation of laws for a given period?

There is no question in this case of validating any act previously done without authority of law, and it cannot be contended that the law relates back, for every expression in the act is prospective. The legislature did not purport to validate, as of July 1st, acts of the governor prior to that time which were not legally done, and no amount of contrary assertion can change the plain meaning of the act in this particular. See State ex rel. Harvey v. Wright, 251 Mo. 325, 158 S. W. 829. It will be time enough to consider the effect of a validating act or curative act when we have such a law before us. Neither is there any question here, as I see it, of relation back by operation of law. When elections are held they must be authorized by existing laws or they are void. Santa Cruz Water Co. v. Kron, 74 Cal. 222, 15 Pac. 772; People v. Johnston, 6 Cal. 673; State ex rel. Heim v. Williams, 114 Wis. 402, 90 N. W. 452,—and I can see no distinction in this regard between an election and an appointment.

The appointments of respondents can in no proper sense be regarded as legislative appointments. They were not made by the legislature, but by the governor. The names of the respondents are not incorporated in the bill, nor did the legislature, as such, assume any responsibility for the selection of the men appointed. What it did attempt to do was to authorize the governor to make appointments with the consent of the senate, and the appointments so made would, of course, be perfectly valid, if the *power* to make them existed at the time. I do not question the proposition that the appointing power is under the control of the legislature. The following authorities fully substantiate this doctrine. People ex rel. Waterman v. Freeman, 80 Cal. 233, 13 Am. St. Rep. 122; 22 Pac. 173; note by Freeman in 13 Am. St. Rep. 125; Fox v. McDonald, 101 Ala. 51, 21 L.R.A. 529, 46 Am. St. Rep. 98, 13 So. 416; State ex rel. Sherman v. George, 22 Or. 142, 16 L.R.A. 737, 29 Am. St. Rep. 586, 29 Pac. 356. The fact that this plenary power of control exists in the legislature makes it all the more important that the power be exercised in accordance with law.

As to the question of contemporaneous construction by all the state

officials, suggested in the opinion of Chief Justice Bruce, if available information is correct this is an over-statement as it appears that some of the state officials at least refrained from regarding laws as in operation during the time for filing referendum petitions. Its inaccuracy is evidenced by the opinion of the attorney general hereinbefore referred to.

I find myself in entire accord with much that is said in the opinion of Mr. Justice Christianson. In this opinion he discusses a number of questions which, to my mind, have little or no bearing upon the case in hand. The real point of disagreement is upon the validity of appointments made without the sanction of an existing law. My views upon this question have been set forth at length in the foregoing opinion, and they are concurred in by my associate, Judge Grace. I am also authorized to say that, while Mr. Justice Robinson holds that the act was in force when the appointments were made and that they were consequently valid, he too agrees that valid appointments cannot be made except under an existing law. Under his view that point is not material.

In the opinion of Mr. Justice Christianson it is stated that if the contentions of the attorney general are correct, it would be impossible for the legislature to provide, in the act creating statutory offices, for the appointment and confirmation of the incumbents of such offices at the same session of the legislature at which they were created, and that, according to his argument, it would be necessary for the governor to refrain from making the nominations until after July 1st, and then call a special session to act upon the appointments. It may be confidently asserted that no such situation would result. As to offices, the creation and filling of which is a matter of real emergency, it may be done in exactly the same way it has always been done heretofore, by the inclusion of a proper emergency clause; and, if it is desired to extend the ground of legal possibility in this direction, all that need be done is to pass a general law or an amendment to existing statutes broadening the scope of the executive powers with reference to vacancy appointments. The foregoing suggestion does not imply any limitation whatsoever upon the legislative power with respect to statutory offices, as suggested by Mr. Justice Christianson. On the contrary it assumes that the matter is within the absolute control of the

legislature, but it does require that this control be exercised by law. Neither is there anything novel or anomalous in the suggestion made. The condition herein commented upon is but the logical result of the more stringent constitutional limitation upon the power of the legislature to place its acts into immediate effect. Should the opinions of Justices Bruce and Christianson become the law of this state, such legislation as is suggested would not, it is true, be required; but in my judgment, it is a safer policy to amend deficiences in existing laws, if they are considered to be deficient, by proper legislative action rather than accomplish the same end by judicial legislation. As I read the opinion of Mr. Justice Christianson, it begs the whole question by starting with the proposition that it is the duty of the court to sustain and apply the legislative intention. The question is not what the legislature intended. That is perfectly clear. The real question is whether the intention they entertained was so expressed so as to become law authorizing what was done in carrying out this intention.

For the foregoing reasons I think there should be a judgment of ouster.

GRACE, J. (dissenting). I dissent from the result arrived at by a majority of the court. Each member of this court is writing more or less fully his opinion in this case, and the opinion when finished will be exceedingly long, and for this reason I do not feel disposed to set forth all my objections to the opinion of the majority and the conclusions therein reached, but will content myself with setting forth a few of the main objections to the majority opinion, and to give my views as to the proper construction of § 25 of art. 2 of the Constitution of the state of North Dakota as amended, and how the same reads when it is amended, and to give my construction of § 67 of the Constitution as amended, and to show how the same reads after the same has been amended, and to construe in part chapter 237 of the Session Laws of 1915.

The amendments to §§ 25 and 67 of the Constitution, and the repeal in part of § 67, and what effect such steps have had, and what if any changes have been made, how those portions of the Constitution now

stand, and how they now read since changed and amended, may be made more clear by comparative analysis.

These amendments which have been added to §§ 25 and 67, and the repeal of part of 67, may be compared to a machine before its various parts are placed together in mechanical harmony. As the part of the machine lie *en masse,* disorganized and disarranged, it is difficult to determine the usefulness of the various parts of such machine, but when the parts of the machine are arranged in their proper mechanical places so that each shall perform its proper part and function as related to the intended use of such machine, the harmony of each part with the other in construction, mechanism, and function, becomes manifest.

If parts of the machine are changed in character by new ideas or inventions, or if entirely new parts are inserted in a portion of such machine, such new parts must function, must perform the work, accomplish the work, for which they were inserted, or they become and are useless and of no value; either they are a necessary, desirable, and usable functional part of such machine, or they are not; they are either used or discarded.

The sovereign will of the people, expressed in the manner prescribed by law, amended § 25, and amended and also repealed part of § 67 of the state Constitution. Like the machine referred to, the people by and through their sovereign will and power added new parts to § 25; they added new parts to § 67, and took out old parts from § 67.

This procedure by the sovereign will of the people, so had, makes this part of the Constitution appear disorganized, uncertain, and unworkable if the new parts so added are not carefully put in their proper place and relation; but as soon as the new parts of the Constitution are inserted in their proper place, placed in their true position and relation, in §§ 25 and 67, and then read after being so properly placed and arranged, harmony at once displaces chaos; certainly displaces doubt; the sovereign will of the people becomes immediately manifest; all doubt and uncertainty are at once dispelled. Section 25 as amended by the supreme power of the state, the sovereign will of the people duly expressed by the electors in the due exercise of their highest and most valuable prerogative, that of suffrage, reads as follows:

"A Concurrent Resolution for an Amendment to the Constitution
Providing for the Initiative and Referendum.

"Amendment. Section 25 of article 2 of the Constitution of the
state of North Dakota is hereby amended to read as follows:

"§ 25.    The legislative authority of the state of North Dakota shall
be vested in a legislative assembly consisting of a senate and house of
representatives, but the people reserve to themselves power to propose
laws and to enact or reject the same at the polls, independent of the
legislative assembly, and also reserve power, at their own option, to
approve or reject at the polls, any act, item, section or part of any act
or measure passed by the legislative assembly.    The first power reserved
by the people is the initiative, or the power to propose measures for
enactment into laws, and at least 10 per cent of the legal voters to be
secured in a majority of the counties of the state shall be required to
propose any measure by initiative petition, and every such petition shall
include the full text of the measure so proposed.    Initiative petitions
shall be filed with the secretary of state not less than thirty days before
any regular session of the legislative assembly; he shall transmit the
same to the legislative assembly as soon as it convenes.    Such initiative
measures shall take precedence over all other measures in the legislative
assembly except appropriation bills, and shall be either enacted or
rejected without change or amendment by the legislative assembly
within forty days.    If any such initiative measure shall be enacted by
the legislative assembly it shall be subject to referendum petition, or
it may be referred by the legislative assembly to the people for approval
or rejection.    If it is rejected or no action is taken upon it by the
legislative assembly within said forty days, the secretary of state shall
submit it to the people for approval or rejection at the next ensuing
regular general election.    The legislative assembly may reject any
measure so proposed by initiative petition and propose a different one
to accomplish the same purpose, and in any such event both measures
shall be submitted by the secretary of state to the people for approval
or rejection at the next ensuing regular election.    If conflicting meas-
ures submitted to the people at the next ensuing election shall be
approved by a majority of the votes severally cast for and against the
same, the one receiving the highest number of affirmative votes shall

thereby become valid, and the other shall thereby be rejected. The second power is the referendum, or the power to order any act, item, or part of any act to be referred to the people for their approval or rejection at the polls, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety), as to any measure or any parts, items or sections of any measures passed by the legislative assembly either by a petition signed by 10 per cent of the legal voters of the state from a majority of the counties, or by the legislative assembly, if a majority of the members elect vote therefor. . . .

"The filing of a referendum petition against one or more items, sections or parts of an act shall not delay the remainder of that act from becoming operative. Referendum petitions against measures passed by the legislative assembly shall be filed with the secretary of state not more than ninety days after the final adjournment of the session of the legislative assembly which passed the measure on which the referendum is demanded. The veto power of the governor shall not extend to measures referred to the people. All elections on measures referred to the people of the state shall be had at biennial regular elections, except as provisions may be made by law for a special election or elections. Any measure referred to the people shall take effect when it is approved by a majority of the votes cast thereon and not otherwise and shall be in force from the date of the official declaration of the vote.

"The enacting clause of all the initiative bills shall be, 'Be it enacted by the people of the state of North Dakota.' This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure. The whole number of votes for secretary of state at the regular election last preceding the filing of any petition for initiative or for the referendum shall be the basis on which the number of legal voters necessary to sign such petition shall be counted.

"Petitions and orders for the initiative and for the referendum shall be filed with the secretary of state, and in submitting the same to the people he and all other officers shall be guided by the general laws and the act submitting this amendment until legislation shall be specially provided therefor.

"This amendment shall be self-executing, but legislation may be enacted to facilitate its operation."

A careful reading of the above § 25 as thus amended can leave no doubt as to the meaning thereof. There is no room for doubt. There is none.

Section 67 was repealed in part and amended. Where the provisions of an earlier constitutional provision are in conflict with a later constitutional provision, it is certainly law that the later constitutional provisions will prevail over the earlier, and where the earlier provisions are inconsistent with the later constitutional provisions, the earlier constitutional provisions are thereby repealed. If a statute is in force and effect and later another statute is enacted and made law which is entirely contrary to the provisions of the first statute, even though nothing is said in the latter statute about repealing the former statute, the former is nevertheless wholly, entirely, and effectively repealed by the enactment of the later law. The two cannot stand together, and hence the later expression is said to be the law because it expresses a later will of the people, who in the last analysis are the paramount authority. Section 67 as it originally stood, and before amended and in part repealed, is entirely inconsistent with the later constitutional amendment thereto contained in the referendum law. Either § 67 in so far as it is inconsistent with the referendum law must fall, or the later expressed will of the people in the referendum law must fall. They are inconsistent; they cannot stand together; one or the other must be inoperative. There cannot be two emergency clauses. The writer of this opinion claims that when the amendment to § 67 as found in the referendum law is placed in its proper relation and position in § 67, as amended, and then read, there can be no doubt but what § 67 is in part repealed, and that the emergency clause contained in § 67 as it originally stood is entirely repealed, and that § 67 as amended reads clearly, and there is no need of construction when the same are placed in their intended positions and so read. Section 67 as repealed in part and amended reads as follows: "No act of the legislative assembly shall take effect until July 1, after the close of the session, unless in case of emergency. . . .

"When it is necessary for the immediate preservation of the public

peace, health or safety that a law shall become effective without delay, such necessity and the facts creating the same shall be stated in one section of the bill, and if upon aye and no vote in each house two thirds of all the members elected to each house shall vote on a separate roll call in favor of the said law going into instant operation for the immediate preservation of the public peace, health or safety, such law shall become operative upon approval by the governor."

Reading the above § 67 as thus amended, is there any doubt,—is there any need for construction? Certainly not. There is no need for construction in either § 25 or § 67 as amended, when they are properly placed, and their parts as amended placed in their proper relation, they afford their own construction, and at once by their clearness dissipate all misunderstanding and doubt and stand forth as the express, solemn will of the sovereign people.

Taking notice also of contemporaneous history, it can readily be gathered that the emergency clause mentioned in § 67 as it originally stood was subjected to much abuse. An examination of the laws discloses that its use became an exceedingly common matter, it being tacked onto bills most frequently.

Now, an emergency clause should not be tacked onto a bill unless there is a real emergency. Emergency implies the necessity for immediate action. It means a condition of affairs that will brook no delay. It means that some law should be passed at once, without delay, for the reason that some public interest, as public health, peace, or safety, might suffer unless there was a law which went into immediate effect. So the people in their sovereign capacity amended § 67 so as to meet all such emergencies, and they said that the only emergency that would necessitate the immediate enactment of a law would be such necessity as would affect the health, peace, or safety of the people of the state; and so they inserted that provision in § 67, and repealed the former emergency clause contained in § 67 by so doing, and at the same time made it more difficult to attach the new emergency clause. Notice, by consideration of § 67 as it originally stood, that the emergency clause could be attached merely by vote of two thirds of the members of each house present taken by an aye and no vote; notice, in the new emergency clause which repealed the emergency clause of § 67, as it originally stood, when a law is passed to which the new emergency clause

36 N. D.—29.

is attached, such emergency must be one that affects the health, peace, or safety of the people, and the reasons and evidence set forth showing that it does affect the peace, health, and safety of the people, and must be contained in a separate section, and in addition to this (notice the difference) it must be passed by a two-thirds vote of all the members of each house *elected*,—not *present,* but *elected;* and the vote must be by a separate vote in each house, and must be an aye and no vote.

It at once becomes manifest what care, caution, study, and thought the people exercised in thinking out and enacting such constitutional amendment. As enacted it constitutes the supreme law of the state. It is the latest expression of the sovereign will of the people. It is the latest fundamental law by which the legislature and the courts, each of whom are nothing more nor less than the servants of the people, must be guided and governed. There is no room for interpretation; there is no room for construction; it is the sovereign will of the people, duly expressed in a proper constitutional amendment, and from the will of the people so expressed there is no appeal. It is the fundamental law, plainly and unequivocally expressed. There is therefore only one emergency clause, and that is the one contained in the referendum law and which makes § 67 read as above. For this reason chapter 237 of the Session Laws of 1915 did not go into effect until the 1st day of July, 1915, and before it went into effect no act could be done under it of any kind or character. No nominations or appointments could be made, and the appointments so made were without the sanction of the law and ineffective and void, and the law was not a law until July 1st. If the legislature had seen fit it could have amended the law relative to vacancies in such manner as to have permitted the governor to appoint persons to fill the offices created by the law at the time when the law became effective, July 1st, and thus have avoided any inconvenience. But, however this may be, it is clear that the emergency clause of § 67 as it originally stood is repealed and is of no further force and effect, and § 67 as amended is in the form in which it has been set out in this dissenting opinion.

Mr. Justice Birdzell has written an exhaustive and clear analysis of the law of this case. It is supported by the weight of authority of other states having a section in the Constitution identical with § 67 and a referendum law similar to our own. His legal analysis so set

forth is unanswerable, and in my opinion is the law. With Justice Birdzell's legal conclusions, analysis, and opinion as to the law of this case I most heartily agree and concur.

I would very much like to go further, with more analyses, and give many other reasons for dissent, but the lengthy condition of the opinion as it will exist in its completed state, including the various dissenting opinions, forbids my going further in giving my reasons for dissent. I therefore close this dissenting opinion by stating that I dissent from the result arrived at by the majority.

After the original opinion was filed, a petition for rehearing was made and filed, and an order entered on June 20, 1917, denying the petition.